UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA


United States of America,      )
                               )
               Plaintiff,      )
                               )
          vs.                  )      File No. 1:16-cr-184
                               )
William Anthony Fly,           )
                               )
               Defendant.      )


TRANSCRIPT OF STATUS CONFERENCE


Taken at
United States Courthouse
Bismarck, North Dakota
June 7, 2017


BEFORE THE HONORABLE DANIEL L. HOVLAND
-- UNITED STATES DISTRICT COURT JUDGE --

<u>APPEARANCES</u>

MR. MATTHEW D. GREENLEY
U.S. Attorney's Office
Quentin N. Burdick U.S. Courthouse
655 First Avenue North, Suite 250
Fargo, North Dakota 58102-4932

                                        FOR THE UNITED STATES


- - - - - - - - - -


MR. CHRISTOPHER P. BELLMORE
Assistant Federal Public Defender
Federal Plaza
324 North Third Street, Suite 1
Bismarck, North Dakota 58501

                                        FOR THE DEFENDANT


- - - - - - - - - -


Certificate of Court Reporter - Page 43


- - - - - - - - - -

1          (The above-entitled matter came before the Court, The

2     Honorable Daniel L. Hovland, United States District Court

3     Judge, presiding, commencing at 11:01 a.m., Wednesday, June 7,

4     2017, in the United States Courthouse, Bismarck, North Dakota.

5     The following proceedings were had and made of record in open

6     court with counsel and the defendant present:)

7                    - - - - - - - - - - -

8          THE COURT:  We'll open the record in the case of

9     *United States of America versus William Fly*.  Why don't I have

10    everybody identify themselves for the record here so that it's

11    clear.  The U.S. marshals is here.

12         MR. DELEON:  Juan Deleon representing the United

13    States Marshal Service.

14         MR. GREENLEY:  I'm Matthew Greenley, Your Honor, with

15    the U.S. Attorney's Office.  Thank you for allowing me to

16    appear by video.

17         MR. BELLMORE:  And I'm Chris Bellmore with the

18    Federal Public Defender's Office on behalf of Mr. Fly.

19         THE COURT:  Mr. Fly, how are you today?

20         THE DEFENDANT:  A little cold.

21         THE COURT:  Pardon?

22         THE DEFENDANT:  A little cold.  I have a --

23         THE COURT:  Cold?

24         THE DEFENDANT:  -- medical condition called

25    Raynaud's.

                                3

1          THE COURT:  What have you -- what are you wearing on

2     your head today, something symbolic, or --

3          THE DEFENDANT:  No, sir.  It's to keep my ears warm.

4     I'm supposed to have a hat, a head covering by medical --

5          THE COURT:  Oh.

6          THE DEFENDANT:  -- documentation here, and otherwise

7     I can get lesions and I can get gangrene from those lesions,

8     which I've already started to on one of my toes again due to

9     the facility I'm at.  And at one of the prior facilities they

10    were going to amputate my toes because of these lesions that --

11         THE COURT:  Lesions that you developed?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  Okay.  Well, this is just scheduled as a

14    status conference, and the only reason that I called it is that

15    I received this letter, a nine-page letter from Mr. Fly that

16    was filed on June 1st.  It's Docket Number 37.  It's been

17    sealed.  And in that letter to me Mr. Fly raised a number of

18    concerns.  I read the letter over again this morning.  Some of

19    it's not so easy to read, but there were a number of complaints

20    that he's asserted, and I really just want to give you an

21    opportunity, sir, to kind of tell me what it is you're

22    complaining about.

23         But I've narrowed it down to complaints about the

24    denial of medical care and medical neglect, allegations of a

25    sexual assault that's never been investigated, claims that you

4

1    have not been allowed to review the discovery and you've got

2    very difficult access to your attorney, and your efforts to

3    contact your defense attorney are being prevented by the law

4    enforcement at the facility that you're housed at.  You made

5    claims that the staff in Devils Lake have tried to dissuade

6    medical personnel from providing any care to you.  You've

7    raised a lot of security issues and concerns about the law

8    enforcement center in Devils Lake and efforts -- or failing to

9    protect you from sexual victimization.

10              I went through the letter, and that's kind of what I

11   came up with for your complaints, but when we cut right through

12   it, what is your -- what is your primary complaint that you

13   wanted to be brought before a judge to voice here today.

14              THE DEFENDANT:  Well, all of those, Your Honor.

15              THE COURT:  Pardon?

16              THE DEFENDANT:  All of those issues, Your Honor.

17              THE COURT:  Okay.

18              THE DEFENDANT:  And, you know, because especially

19   with my medical issues, they could risk life and limb, and the

20   marshals and -- have been very unsymptomatic (sic) to that.

21              THE COURT:  Have been very what?

22              THE DEFENDANT:  Have no sympathy towards it, you

23   know, and --

24              THE COURT:  Okay.

25              THE DEFENDANT:  -- they have, according to the

1    administrator, Rob Johnson --

2            THE COURT:  And this is in Devils Lake.

3            THE DEFENDANT:  In Devils Lake.

4            THE COURT:  Lake Region Correctional Center.

5            THE DEFENDANT:  Lake Region Correctional Center, yes,

6    or law enforcement center.  They -- he was informed by them,

7    contrary to what they had told the Court in September, that my

8    medical treatments were going to be made, these things.  And

9    then he wrote me a letter and stated in that that, well, they

10   were saying that that was all going to be denied.  It's like

11   okay.  And on documentation that they provide during transfer

12   it says wording such as "detainee states, detainee states,

13   detainee states."  No, this has already been brought up in the

14   court.  They already have documentation.

15           And, you know, they have moved me from facility to

16   facility to facility to facility, and just when I'm at a

17   facility that might have a medical personnel available -- which

18   Devils Lake does not readily have that available.  They

19   contract out and you have to, you know --

20           THE COURT:  Well, they do in most county facilities

21   because they simply can't hire a full-time medical doctor to be

22   there, so they have to contract out.  They're in isolated areas

23   oftentimes and --

24           THE DEFENDANT:  Oh, it -- my medical documentation

25   says that I have to see a medical doctor daily, especially with

6

1    my Raynaud's, if I'm in a facility --

2              THE COURT:  What --

3              THE DEFENDANT:  -- and --

4              THE COURT:  What medical documentation says that?

5              MR. BELLMORE:  Your Honor, if I may interject, we

6    received some documentation, medical records from the

7    Department of Corrections in Arizona.  Mr. Fly was there a few

8    years ago, and they outline his condition and a treatment plan,

9    and that's largely, I think, what Mr. Fly is asking for,

10   placement in a facility that can accommodate him as he was in

11   Arizona.

12             THE COURT:  But there's medical records that say that

13   he is required to see a physician daily?

14             MR. BELLMORE:  That, I don't recall, but it outlines

15   the issue with the Raynaud's, his dietary issues with diabetes.

16             THE DEFENDANT:  Hypoglycemia.

17             MR. BELLMORE:  Excuse me.

18             THE COURT:  What are you looking at, Mr. Fly?

19             THE DEFENDANT:  I'm looking at the medical -- the

20   actual medical record, and I'm looking at the doctor's notes

21   where --

22             THE COURT:  Where is the medical record from?

23             THE DEFENDANT:  From like he said.

24             THE COURT:  Department of Corrections?

25             THE DEFENDANT:  Yes, Dr. Milazzo.

7

1          THE COURT:  What year is that?

2          THE DEFENDANT:  2009 and '10.

3          THE COURT:  Okay.  That's a fairly old medical

4    record, but --

5          THE DEFENDANT:  Yeah, but it's a permanent disease.

6    It don't go away, and --

7          THE COURT:  Right.  I'm familiar --

8          THE DEFENDANT:  -- it's a genetic disorder.

9          THE COURT:  I'm familiar with the condition.

10          THE DEFENDANT:  Yes, and what happens is if I'm in an

11    air-conditioned room or if I'm in a cold area, my blood

12    circulation shuts off, and then, you know, I -- that's why the

13    lesions start happening, and then they don't heal, and then

14    they turn to gangrene, and it causes severe pain upon my body.

15    And they have me in a very air-conditioned room, and they've

16    repeatedly taken my blankets and my clothes and, you know, left

17    me in there.  And this last time over the last weekend I ended

18    up having another lesion with one of my toes, and it's turning

19    black, and I will at least presumably loose my toenail on the

20    large toe from that at this point.

21          And I have one of the rashes on my back that is very

22    severe, and it's been in pain for several weeks now.  And

23    they've done everything to ignore me as far as medical until

24    just -- I believe it was Sunday night I talked to Sergeant

25    Little Wind and said, "Look at this."  And she thought it was

1    shingles, so she called the nurse, who had been not responding

2    to any of my medical requests, even stuff in April, you know,

3    not to mention the PREA complaints and things like that and the

4    medical complaints and the grievances I had filed in November

5    that went unresponded to until I talked to an advocate on the

6    outside, who came in in January -- late January and February

7    and asked them about that and why they hadn't responded to

8    anything.

9         The facility, you know, is really not equipped.  The

10   -- I talked to Captain Armstrong yesterday.  He said, "We're

11   not equipped to handle these medical issues.  We've tried

12   talking to the marshals to get you transferred several times.

13   They keep bucking us on this, and" --

14        THE COURT:  Where would you like to be transferred

15   to?

16        THE DEFENDANT:  Well, Burleigh.  The -- the marshals

17   had originally sent me to see Dr. Sethi there for my hormone

18   treatments.

19        THE COURT:  Doctor who?

20        THE DEFENDANT:  Sethi.  Muhammad Sethi.

21        THE COURT:  From Bismarck?

22        THE DEFENDANT:  From Bismarck, yes.  He's at Rosser

23   and -- what is it? -- Eleventh or Fourth Street.  Fourth Street

24   and Rosser, right?

25        THE COURT:  A specialist in what area of medicine?

1           THE DEFENDANT:  Endocrinology.

2           THE COURT:  Endocrinology?

3           THE DEFENDANT:  Yes.

4           THE COURT:  Okay.

5           THE DEFENDANT:  And so -- and because I was born

6    intersex, a hermaphrodite, and -- you might be more familiar

7    with, but --

8           THE COURT:  Say that again.

9           THE DEFENDANT:  Intersex, it's a term.

10          THE COURT:  Okay.

11          THE DEFENDANT:  And --

12          THE COURT:  So you're in the process of going through

13   some sex changes?

14          THE DEFENDANT:  Well, that's transsexual.  Intersex

15   means I was born with both aspects, you know, both male and

16   female --

17          THE COURT:  Okay.

18          THE DEFENDANT:  -- type of thing, and -- but, yes,

19   I've been doing that and the hormone therapies, and whatnot.

20   And then we've been trying to get this addressed.  They moved

21   me all over the country from Idaho, and I had seen several

22   doctors along the way, and it's like every time I got to see a

23   doctor who would approve this or send in a request for that,

24   they would transfer me to another location, and --

25          THE COURT:  Well, it is a difficult issue for jail

1    administrators to deal with nationwide, I think.

2          THE DEFENDANT:  Yes, the PREA auditor that came in

3    from New Mexico I spoke with yesterday and said Hawaii seems to

4    be the only place that is really onboard with --

5          THE COURT:  Well, I can't just -- I can't send you to

6    Hawaii.

7          THE DEFENDANT:  Yeah, I can understand that, although

8    the weather conditions would be much better for me there.

9          THE COURT:  Probably.

10          THE DEFENDANT:  But, you know, at least at like

11    Burleigh here, my attorney can have access to me.  The -- they

12    have 24-hour, at least, nurses.  They might not have a doctor

13    on 24 hours, but they have nursing staff that works 24 hours,

14    and they're a lot more willing to make reasonable

15    accommodations here at Burleigh because I was there for a

16    number of days.

17          THE COURT:  Okay.

18          THE DEFENDANT:  And, you know, we had a couple of

19    struggles, but the major, he came in and, you know, worked

20    those out, and it seemed like things would go okay.  But then

21    they moved me to Washburn, and, you know, there I was just

22    stuck in isolation and -- you know, for a couple months, and a

23    lot of the isolation has also caused delirium with me, so --

24    severe delirium.  And, you know, I've heard -- had audio --

25    auditory hallucinations at times like in Oklahoma where they

11

1    had me.

2                THE COURT:  At the designation center?

3                THE DEFENDANT:  Say again?

4                THE COURT:  You were in federal custody in Oklahoma?

5                THE DEFENDANT:  Yes, they -- they took me from Idaho

6    to Las Vegas.  I went to a federal facility there in Las Vegas

7    or Pahrump, Nevada.  And then they flew me out to Oklahoma, to

8    -- and then took me down to Grady County, and I was at a county

9    jail there.  There was -- probably the most disgusting one I've

10   been at so far, and then they took me up here.

11               In fact, on the way here from there, one of the

12   marshals had pretty much molested me and -- because I have

13   female breasts, he kept opening up my shirt and looking at them

14   and then went down and did the pat-down down my leg and back up

15   and felt up in my crouch area and back down and did that again.

16               THE COURT:  Where was this at?  What --

17               THE DEFENDANT:  This was in Oklahoma City, Your

18   Honor.

19               THE COURT:  At the federal designation center, or --

20               THE DEFENDANT:  It was at the air transport center --

21               THE COURT:  Okay.

22               THE DEFENDANT:  -- where -- right before we got on

23   the plane, and they -- you know, I had brought it up, you know,

24   because I went to Stutsman County here, and I told them when I

25   got there after going to Sioux Falls jail, and then they

 1   brought me up here.  Then I -- they wanted me to talk to the

 2   nurse, and I talked to her all about that, and stuff, and then

 3   they had a PREA counselor talk to me.

 4           And then I got transferred to Burleigh.  And then I

 5   had a court here, and at that court we had brought these issues

 6   up, and the marshal said to the Court that they were -- you

 7   know, I was already approved for these things, they were going

 8   to be taken care of.  My hormone therapies were going to be

 9   taken care of, my doctor's things, my Raynaud's, all that, and,

10   you know, so that's where we thought the things were going.

11           And then when I got back over to Burleigh jail, the

12   nurse said, "Well, the marshals said not to get you -- you

13   know, get you in or set you up for a doctor, or anything, you

14   know, because you're going to get transferred up to Rugby

15   anyway.  You know, you're getting transferred out of here."

16   And I thought, well, yeah, but I still need this stuff done,

17   you know, so we need to get that on the ball.

18           And so then they transferred me to Washburn instead

19   of Rugby, and I sat there.  And then Captain Krohmer there,

20   Wade Krohmer, he took me to the women's clinic and to the --

21   over to the doctor over there and to women's radiology, and I

22   had various things they -- he wanted me checked out for -- I

23   had high prolactins and --

24           THE COURT:  You have what?

25           THE DEFENDANT:  High prolactin levels, and this can

1    be -- mean that I have brain tumors, prolactinomas, and, you

2    know, I've had no follow-up on that.

3              Then I had a mammogram.  You know, he said I'm at the

4    age I need to start doing regular mammograms, and so I had that

5    done, found out I don't have cancer.

6              But they -- he did a DEXA scan and found out I have

7    osteoporosis, and that wasn't even in -- I didn't even get that

8    until I got to Devils Lake.  And they took me to Rugby first,

9    and then I went there for a night and then out to Devils Lake.

10             And the nurse who's retired but coming in just every

11   once in awhile to check up on people, she came in and she said,

12   "Okay, we -- I got a file for you, and it says you got

13   osteoporosis and all these things, and you need to be

14   transferred because we can't take care of you here with all

15   these things going on.  You'll have to go to either Grand Forks

16   -- or Bismarck, Grand Forks or Fargo, and, you know, those are

17   the only places that will have any type of care for you in this

18   entire state."  And so I was waiting on that transfer, and I

19   put in several grievances and notices about that.

20             And even though my file had been flagged that I had

21   been sexually assaulted in a previous facility as well and --

22   and I had seen numerous doctors; in fact, one in Oklahoma City

23   that went over the difference between intersex and transsexual

24   with me and told me, "You realize you're a hermaphrodite," and

25   had a team of people with him, which made it very uncomfortable

                              14

1    and very embarrassing to go through this and to go through it

2    over and over and over at every facility that I've had to go

3    to.

4            When in Idaho, that they said the chief marshal out

5    there was going to take care of it and make sure it's all in

6    the system.  And now I've got a new manual here that the

7    Department of Justice put out that, they sent out to the Bureau

8    of Prisons, but it's also in a pretrial status for the U.S.

9    marshals to follow, following people with my status, and

10   they're supposed to put us in the system that way.  And they

11   said that they were going to flag me, you know, in the system

12   and that I wouldn't face these problems, and I faced quite a

13   few of them, you know, even since then.

14           THE COURT:  When is your trial date?

15           THE DEFENDANT:  Well, it's been put off several

16   times.  At least one of those times I feel was under duress,

17   you know, because the -- you know, my lawyer hasn't had the

18   ability to come visit me.  I'm way too far away for him to come

19   up to see me and go over any discovery.

20           THE COURT:  So are you saying you haven't reviewed

21   any of the discovery?

22           THE DEFENDANT:  Very little of it.  You know, at one

23   point I hadn't, you know, even though he had had it.  You know,

24   he came up and tried to use his computer, and they don't have

25   Internet access for him to get into the system and that sort of

1    thing.  And he said, "Wow, I can't even get into this," you

2    know, so he went back.  It was a wasted trip for him to come up

3    there.  He -- he went back.  He had to come back on another day

4    and downloaded this stuff onto his computer, and then he

5    brought it up, and then he couldn't access a lot of it.  Then

6    so we didn't get to go over that.  He had to say, "I'll have to

7    come back."

8         And then after a few times of that, he asked if he

9    could get it printed out and transcribed.  And he tried to do

10   that, and some of it was untranscribable, so, you know, they --

11   they weren't able to get some of it done.  And then others is

12   -- you need a magnifying glass to even look at it.  You know,

13   it's almost microscopic.

14        THE COURT:  So, Mr. Bellmore, what's the -- the

15   trial, I was told, is July 17th.  What's the issue about

16   discovery?

17        MR. BELLMORE:  Well, he's right about the distance.

18   That's a -- always a problem for anyone who is in Devils Lake

19   for our office to visit, but we have an investigator assigned

20   to the case.  I've been up there a dozen times.

21        THE COURT:  A dozen times?

22        MR. BELLMORE:  Oh, yeah, easily.  This has been going

23   on -- this is -- we're approaching almost one year since --

24        THE COURT:  Well, then we need to get the case tried

25   and --

1          MR. BELLMORE:  I agree.

2          THE COURT:  -- move on.

3          THE DEFENDANT:  Yes.

4          MR. BELLMORE:  But a lot of the -- a lot of the -- I

5    would just say a lot of times the meetings have been consumed

6    with these issues as opposed to discovery.  The discovery has

7    always been available to him.  We go to Devils Lake on a

8    regular basis.  It is a -- it is a chore to get up there for

9    myself, as well as investigators to travel in person, but we --

10   we do it in person, and we are -- we are there.

11         THE COURT:  But you've reviewed the -- you've

12   reviewed the discovery with Mr. Fly?

13         MR. BELLMORE:  Yes, we've given him that.  We also

14   review it in person, go over it together, as well as we have a

15   system where we can have it left with him in a room and collect

16   it when he's done reviewing it, and then we take it home again.

17         THE COURT:  And that's been done?

18         MR. BELLMORE:  That's been -- that's been done at

19   least -- at least three times.

20         THE DEFENDANT:  Twice.

21         MR. BELLMORE:  Twice by me.  I would --

22         THE COURT:  So have you -- you've had access to the

23   discovery or the evidence in Devils Lake?

24         THE DEFENDANT:  For very short periods of time.  And,

25   you know, like one of the things is, oh, wow, you only got to

                              17

1    page 34 out of 1,500.  It's pretty well in-depth.  And, you

2    know, maybe most people would just -- don't even look at it,

3    but I want to thoroughly go -- be able to have the opportunity

4    to go through and look at everything and take notes on that and

5    to supply notes to Mr. Bellmore and, you know, things that are

6    absolutely going to prove my innocence in this.  And, you know,

7    this is -- you know, there's -- it's just been incredible that

8    I've not been able to have that opportunity to truly go through

9    that, you know, and --

10            THE COURT:  But is it -- is the discovery there in

11    Devils Lake, where you can go into a room and look at it

12    whenever you wish?

13            THE DEFENDANT:  No, Your Honor, they have to bring it

14    back with them.  And when they come up to visit another inmate

15    or -- like one day Chris had said that he would be there,

16    Mr. Bellmore.  He'd come up and told the captain, "Here, I'll

17    be back at 5:00," and it was like 3:00.  And he came back at

18    4:00 and picked it up.  But he was meeting with another

19    detainee, another client of his, and then he had to get back

20    here.

21            And it's really a great distance, and it -- you know,

22    especially throughout the winter, when there's snow and ice and

23    blizzard conditions, and stuff.  Even at times they've made

24    appointments to come up, they haven't been able to, and --

25            THE COURT:  Well, we can remedy that by getting you

18

1    closer to Bismarck, so --

2                THE DEFENDANT:  Absolutely, and --

3                THE COURT:  But, Mr. Bellmore, is the discovery left

4    there, or is it not left there?

5                MR. BELLMORE:  No, it's -- we've got a stipulated

6    discovery order, so what we do is we will -- we will bring it

7    there, review it with him in person, but understanding that

8    there is -- there is a substantial amount of at least paper

9    discovery.  What we do is if it's not myself personally there,

10   we'll have another attorney drop it off, arrange for him to be

11   in a room so discovery can be accounted for, and then -- and

12   then we take it back with us.

13                THE COURT:  All right.

14                MR. BELLMORE:  And so that kind of gives the

15   opportunity -- so it's not just me, not just my investigator,

16   but it's another investigator or other attorneys that are going

17   up there, that there's just more opportunities for Mr. Fly to

18   review the discovery.

19                THE COURT:  All right.  Well, I want to hear from the

20   government as well.  And maybe we can remedy some or most of

21   these problems by having you placed closer to your attorney in

22   North Dakota -- or in Bismarck here, but --

23                THE DEFENDANT:  That would be great, Your Honor.

24   And, you know, I'm not supposed to be in a room less than 80

25   degrees.  And even like in this room, it's very cold to me and

1    it starts causing reaction.  My fingers are getting very cold.

2    I'm supposed to wear gloves and like a ski cap, and I'm

3    supposed to cover all extremities, my ears and nose and toes

4    and fingers and arms and legs and things like that because

5    those are the first things that go, and --

6            THE COURT:  So, Mr. Werner, you can take care of

7    that, can't you?

8            MR. WERNER:  No comment, Your Honor.

9            THE COURT:  All right.  But let's hear from the U.S.

10   Attorney's Office first.  Mr. Greenley.

11           MR. GREENLEY:  If I may, Your Honor, I would call

12   Juan Deleon from the U.S. Marshal Service to address some of

13   these issues.

14           THE COURT:  You don't have to testify and -- sir.  We

15   can take care of this -- it's a status conference.  It's not an

16   evidentiary hearing.  We're not taking testimony.  I just want

17   to give everybody a chance to weigh in and tell me what their

18   view is of the problems and how we can best remedy it.  So

19   we'll hear from the U.S. marshals here first.

20           MR. DELEON:  Your Honor, Mr. Fly did come over to us.

21   He was arrested in the District of Idaho, came over on the air

22   lift.  Ourselves -- they conducted a PREA investigation on that

23   incident on the air lift, plus other entities have conducted

24   that PREA investigation also.  Everything has been unfounded as

25   of right now.

1            The first facility he went to was Stutsman, and he

2    sent PREA notifications while he was at Stutsman, so we had to

3    eventually get him out of Stutsman.  It wasn't our choice.  So

4    we took him over to Burleigh County.  He did the same thing in

5    Burleigh County, sent PREA notifications while he was in

6    Burleigh County, and Burleigh County told us, "We don't have

7    enough staff to handle this -- this type of situation."  The

8    same thing -- went over to McLean, the same thing in McLean,

9    and tried to take him over to Rugby because -- but because of

10   the situation in Rugby and the incident happened in the Rugby

11   area, we couldn't house him there, so he's been in Devils Lake.

12           Every medical request that we get, we send it over to

13   our OIMS, which is the Office of Interagency Medical Services,

14   and they look at the request.  They do the research.  They talk

15   to the nurse at the facility.  They talk to the doctors.  If

16   there's any medical documentation on this -- on the specific

17   medical request, they -- they do the research.  They send it

18   back to us approved or denied.  We send that over to the

19   facilities, and the facilities are responsible to do the

20   medical appointments, and that's how the process works.

21           THE COURT:  So where are the people that conduct that

22   review and analysis concerning requests for medical care?

23           MR. DELEON:  The only headquarters, Your Honor --

24           THE COURT:  In D.C., or --

25           MR. DELEON:  In D.C.  It's just medical professionals

1    by the U.S. Public Health Service, and they're all dedicated in

2    D.C.  They cover the specific region, and we send all our

3    medical requests through there, and they're the ones that

4    actually conduct the research.  And they send back the

5    notification to us, and we forward it over to the facilities.

6              And the defendant did see a doctor in Bismarck.  He

7    went back for blood work, and the doctor -- I think the last

8    thing was gender disorder.

9              THE COURT:  Was what?

10             MR. DELEON:  A gender disorder psych eval, and that

11   was just conducted about a week ago in Devils Lake.

12             THE COURT:  The psychological evaluation?

13             THE DEFENDANT:  Gender dysphoria is what he's saying,

14   Your Honor.

15             THE COURT:  Pardon?

16             THE DEFENDANT:  Gender dysphoria.

17             THE COURT:  Okay.

18             MR. DELEON:  And that was conducted -- that was

19   finished about a week ago, but we haven't got the report back

20   yet.  I know there was some issues because the doctor wasn't

21   able to obtain any medical documentation.

22             THE COURT:  Why is that?

23             MR. DELEON:  Just whenever -- whenever he's gone to a

24   facility, that each of the facilities haven't been able to

25   obtain medical documentation on the specific issue he's talking

1    about, the hormone therapy, so --

2          THE COURT:  Because he refuses to sign

3    authorizations, or --

4          MR. DELEON:  I know there was an issue with that at

5    first in Devils Lake, and I think he did -- recently signed it.

6          THE DEFENDANT:  No, actually I had signed one in --

7    the original nurse, she had got the information, but then it

8    disappeared.  And the medical file, the one even that she had

9    come up with, she had said, "Well, you have osteoporosis."

10   Well, they didn't have a nurse for several months.

11         And then later on the new nurse in -- I think it was

12   March or April that came in, and -- before I went to see

13   someone up there, but she had come in and she told me, "Well, I

14   don't have anything."  And then the people there kept telling

15   me, "Well, they've misplaced your medical file.  They don't

16   have your medical file.  They've lost it."  And I thought,

17   well, that's kind of negligent.  That's medical negligence.

18   And then --

19         THE COURT:  Well, it's not medical negligence.

20         THE DEFENDANT:  Well, losing -- it's any kind of

21   negligence if you lose a file, but if the -- but Rob Johnson

22   had responded also in one of his letters to me in regards to

23   that, saying that his nurse -- the new nurse had actually

24   discovered some of that regarding the hormone therapy and

25   regarding other things and that she would be sending certain

23

1 requests in.

2 And he had also responded that, you know, the last

3 that he did talk to the marshals about it, when he spoke to

4 Juan, that Juan had told him that these things would not be

5 approved after they had already said to the judge and to the

6 Court that they were approved and they were coming.

7 And then, you know, a letter from the OMIS (sic) had

8 stated in their e-mails that, hey, yeah, we can send you to an

9 endocrinologist, but due to being intersex or transsexual, we

10 cannot send you to a gynecologist, which they ended up sending

11 me to the women's clinic anyway, and stuff. And, you know, I

12 have those issues, and I had no less than three MDs and one

13 doctor of osteopathy try to send me to a gynecologist and to an

14 endocrinologist, and they approved the gynecologist.

15 But according to their documentation, 28 CFR

16 115.15(e), I believe, it's -- they were concerned that

17 facilities cannot look at the genitalia of an intersex or

18 transgender person, and this would -- in their opinion, they

19 made it as though they would feel that way, that this could

20 constitute -- or institute that if a gynecologist were to

21 review me for that, and so --

22 THE COURT: So what kind of a doctor should be

23 conducting that examination?

24 THE DEFENDANT: Well, it -- it was beyond me, but

25 the --

24

1              THE COURT:  That's beyond me too, but I --

2              THE DEFENDANT:  But I was trying to get, you know,

3     the regular hormones, you know, and the stuff.  And one of them

4     happens to be a birth control, and it's medroxyprogesterone.

5     And, you know, I haven't been taking that or the estrogen, and

6     I need estrogen.  I became very hormonal since being down,

7     which has caused me to go through crying spells out of nowhere

8     and things like that, and, you know, just totally not being

9     able to do anything, and that makes me very victimize -- you

10    know, subject to victimization and --

11             THE COURT:  So are you on a regimen of hormone

12    therapy now?

13             THE DEFENDANT:  Not currently, not since being

14    incarcerated, and that's the whole problem, and we've been

15    trying to get that taken care of.  And I've been trying to get

16    my Raynaud's medication, which is also a heart medication,

17    Enalapril.  And I've been having chest pains, and I've been

18    having signs of a stroke or maybe a brain aneurism because of

19    -- my left side of my face has been numb.

20             And I've had severe headaches, and I've told that to

21    them.  They didn't -- you know, they don't think that a cardiac

22    arrest or a brain aneurism or the brain tumors that were in my

23    head, they don't think that that's very serious, and medically

24    it's very serious.

25             In fact, the hormone therapy for a transgender person

25

1    is considered to be cruel and unusual punishment, an Eighth

2    Amendment violation if not provided to a person while

3    incarceration, and it's been -- you know, they -- I did have

4    documentation of case law about that that I had, but the

5    marshals took that from me.

6         THE COURT:  Well, what's -- what hormone or hormones

7    had you been on before it was discontinued?

8         THE DEFENDANT:  Estradiol and medroxyprogesterone.

9         THE COURT:  And who had those been prescribed by?

10         THE DEFENDANT:  Well, most recently, especially since

11   Obamacare came into effect and everything went up extremely

12   high, it's easier to -- and cheaper to buy things in Mexico and

13   in Canada, and so since --

14         THE COURT:  But my question is, who was it prescribed

15   by?

16         THE DEFENDANT:  A doctor down there.

17         THE COURT:  In Mexico?

18         THE DEFENDANT:  Prior to that it was prescribed in

19   Arizona and in California, and we've been --

20         THE COURT:  Do you have the script, or --

21         THE DEFENDANT:  Well, Mr. Bellmore's staff has been

22   sending out -- in fact, that's how I go got this particular

23   documentation that I have right here.  They've been sending out

24   requests for information, and they've been finding that it's

25   too old.  This doctor here had said his -- been in the last two

26

1    years or five years for things, and before that they would not

2    have any information.

3              Some of these doctors and medical staff before

4    Digital Millennium Act, they just discarded it after a couple

5    years and they don't have any information, including an initial

6    surgery that I had in -- you know, when I was little back in

7    California that I was supposed to be able to -- you know, they

8    did -- they caused my urethra -- it wasn't attached to, you

9    know, what would be a clitoris, and they -- and if it's so long

10   they call it a penis to an intersex person.  And so they tried

11   to attach that so that I could potentially avoid standing up.

12   And my parents wanted a boy, and they went with that, and so

13   we -- you know, but they still have not been able even to find

14   my birth record down there in California.  They requested that

15   because the hospital has changed hands so many times --

16             THE COURT:  So when did you --

17             THE DEFENDANT:  -- plus the records are too old.

18             THE COURT:  When did you start hormone therapy and --

19             THE DEFENDANT:  Well, even according --

20             THE COURT:  After seeing someone in Mexico?

21             THE DEFENDANT:  According to Dr. Sethi's notes here,

22   it -- over 12 years.  You know, then that would have been, you

23   know, six months ago, or so, or eight months ago or more.

24             THE COURT:  Had you been on hormone therapy

25   continuously for 12 years?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  All right.  So let me get back to my

3    earlier question.  Juan, what's the realistic possibility of

4    having this -- having Mr. Fly transported to a correctional

5    facility closer to Bismarck so that he can have access to his

6    attorney, being we've got a trial that's coming up in a month?

7          MR. DELEON:  I would say closer to trial, Your Honor.

8    At this point I will have to call the facilities and inquire.

9    All the local facilities already know about the issue, so I

10   would say it's just -- it's more of a possibility to get him

11   close when it gets closer to trial.  I just don't know how much

12   of a possibility it is right now.

13         THE COURT:  So what facilities has he been at

14   already?

15         MR. DELEON:  He has been at Stutsman -- Stutsman

16   County, Burleigh County, McLean, and Devils Lake.

17         THE DEFENDANT:  Your Honor, the only complaint at

18   Burleigh County was, there were some people catcalling me and

19   then the PREA thing that --

20         THE COURT:  Catcalling you?

21         THE DEFENDANT:  Yeah.

22         THE COURT:  Okay.

23         THE DEFENDANT:  And that -- that's it.  And, you

24   know, the major took care of that.  Then he made it sure that I

25   wouldn't be -- you know, go anywhere near the male inmates at

1    all and things were resolved, you know.

2              THE COURT:  All right.  Mr. Bellmore, is there

3    anything you wanted to say?

4              MR. BELLMORE:  No, I just -- you know, at obviously

5    -- as I said, obviously the closer he is, the easier it is for

6    us to work -- work with him together to get prepared for trial.

7    But, you know, also, if he's closer to a metropolitan facility

8    in Bismarck -- we suggested Fargo as well.  I mean, that's

9    still a ways away.  Easier to access than Devils Lake.  That

10   would allow him to have access maybe to medical treatment.

11             What my takeaway is, there was an appointment with

12   this Dr. Sethi in Bismarck, and then he's been moved.  And so I

13   think I agree with Mr. Fly in that if you get -- it takes a

14   while to get that appointment, but once he's gotten that

15   appointment, he's been moved and everything just kind of gets

16   lost and has to get -- and get reset.  If he were in a place

17   such as Bismarck, where he would have access to a doctor I

18   would imagine hopefully sooner than later and maybe a chance

19   for some follow -- follow-ups would -- we could at least know

20   what's going on and --

21             THE COURT:  But --

22             MR. BELLMORE:  -- either treat it or move on from it

23   because --

24             THE COURT:  There has been an appointment with

25   Dr. Sethi that's actually occurred, or --

29

1          MR. BELLMORE:  My understanding was when he was in

2    McLean County, Washburn, he was brought down to Bismarck and he

3    got the -- he got the initial doctor visit that he needed to

4    kind of get the wheels in motion as far as this hormone stuff.

5          THE COURT:  But did Dr. Sethi prescribe any hormone

6    medication?

7          MR. BELLMORE:  No.

8          THE DEFENDANT:  Dr. Sethi was waiting on -- one of

9    the criteria that he wanted to do -- because we were

10   essentially trying to just start from scratch, so we didn't

11   have to keep ordering documentation from everywhere.  And that

12   was brought up in court in September 2016 regarding this

13   specific issue, you know.

14         And Nurse Wendy had tried to -- from Jamestown,

15   Stutsman County, she had tried to get everything started just

16   from scratch and had me see a doctor and everything there.  And

17   then I got transferred right after that out to here, and then

18   we were trying to get that resolved.  And then I ended up after

19   that court, going to see Dr. Sethi, but they transferred me

20   over to McLean County first and told them, "Don't help this

21   person out here," you know.  Then that's what the nurse told me

22   that the marshals told her, and --

23         THE COURT:  The marshals told the nurse --

24         THE DEFENDANT:  They told the nurse to not --

25         THE COURT:  -- not to give you any help?

1          THE DEFENDANT:  -- not to give me any help because
2    they were planning to transfer me, and do it after the transfer
3    to -- what was intended to be Rugby, but then they sent me to
4    McLean County first.  And so I ended up going there, and it
5    became to seem like every time I was attempting to get medical
6    help, they were, whatever reasoning, trying to dissuade this
7    happening.
8          It's common knowledge -- you know, if you go to the
9    Transgender Law Center, they're going to tell you that these
10   kind of issues happen frequency (sic) with, you know, a person
11   -- you know, a transgender person and that anyone that's
12   intersex or transsexual is going to face these issues,
13   especially under marshal custody.  And they've been ordered
14   over and over by judges -- federal judges to make sure that
15   these things are taken care of.  And that's why I have this
16   manual here that they also sent me from the Department of
17   Justice.  It gives a guideline of what they're supposed to be
18   doing, and the marshals are supposed to be making sure that
19   this medical is being taken care of with me.
20         And Dr. Sethi had referred to psychiatry, which, you
21   know, I went months and months and months without seeing
22   anybody, and I still had that referral.  And they moved me off,
23   and he wanted me seen here, and he wanted me to be seen back
24   with him so that he can get those hormones started, and it's --
25   the suicidality rate is really high for people of this

1    persuasion due to the -- you know, if they're not taking their

2    hormones or they're not going through their treatments.  You

3    know, it's -- it causes severe emotional distress upon them and

4    high anxiety, and I've definitely got high anxiety and severe

5    emotional distress.  And the most discriminated I've been has

6    been where I'm at now, but the --

7            THE COURT:  Have you looked into any endocrinologist

8    in the Grand Forks area, which is -- they've got a large

9    medical community there, and --

10           THE DEFENDANT:  In -- well, they -- the marshals are

11   the ones that sent me to Dr. Sethi here.

12           THE COURT:  All right.

13           THE DEFENDANT:  And I went over there and, you know,

14   we got started.  And, you know, since I've been at Devils Lake,

15   I had some other issues came up.

16           And then that new nurse that is there, she -- Jenny,

17   she came up with, "Well, okay, I'll go ahead and send you over

18   to this doctor because I see you have all this medical

19   documentation now.  You know, we have all this stuff."  So she

20   sent me over to this doctor that, when I got there, one of the

21   people that says he transports for the marshals and he's

22   working for the jail up there -- he's a retired law enforcement

23   officer from the area.  He would tell her, "No, you can't do

24   that.  You can't do that.  You can't do that because you have

25   to go through the marshals."

1          And then she just said, "Well, I can't help you.  I'm

2    not a specialist, and you -- you already are seeing Dr. Sethi

3    in Bismarck.  You need to go back to Dr. Sethi and see Dr.

4    Sethi in Bismarck and then you can move on, because, you know,

5    once a doctor starts you on a treatment plan, nobody else wants

6    to help you."

7          And that's essentially what's been happening

8    constantly, over and over and over again, moving on to the next

9    place, to the next place, to the next place, when I could have

10   already been taken care of sitting right here in Burleigh

11   County and going to the doctor that's only three blocks away

12   down the street and going to the hospital that's across the

13   street, and going down to the women's clinic that's, you know,

14   just downtown here.  And, you know, they would have had plenty

15   of resources right here, which they don't have in Devils Lake

16   and which the original nurse said that I would have to end up

17   coming back here to even get seen, and, you know, this is

18   causing severe trauma upon me.

19         And, you know, I -- I can't even think about anything

20   except the severe pain I get from the cold in the room, the

21   severe, you know, security risk of where I'm at because the

22   cameras don't work, the -- the call buttons don't work.

23         They -- you know, they put me in with a cellmate that

24   -- at one point that is there for two counts of rape and, you

25   know, knowing that I had previous PREA things on my thing, and

1    they said that, "Oh, this person isn't going to bother you."

2    And then he's told him -- told two officers there, "I'm going

3    to hunt Fly and, you know, I'm going to rape Fly," and stuff,

4    when they forgot to give him his medication for several days.

5    And so this -- you know, this has just been a constant issue.

6          And then, you know, since then they've had me

7    separate, but they've, you know, put me in a situation where

8    they left me in a room and then they sent another inmate in

9    there that could have attacked me, you know, and there's no

10   cameras in the room.  And one was in the bathroom, and I was

11   changing.  And I have female body parts and, you know, they --

12   they see that and they get attracted to that for whatever

13   reason, and they -- you know, and you go to sit down to pee, or

14   something, and they -- you know, it turns them on.  You take a

15   shower and they see your boobs and they want to attack you.

16   It's -- it's really frustrating.

17          THE COURT:  So, Juan, what -- what's the status with

18   Dr. Sethi in Bismarck?

19          MR. DELEON:  Dr. Sethi did see him.  He did approve

20   him for gender disorder psych evaluation, which was done.

21          THE COURT:  But we don't have that evaluation yet.

22          MR. DELEON:  We're waiting the report.  She said the

23   doctor should send us an e-mail yesterday and said it's taking

24   longer than anticipated, so we should be receiving that report

25   back.  If the doctor says he has to go back to see Dr. Sethi,

1    well, Devils Lake will just have to take him back there.

2         THE COURT:  Who did the -- where was the clinical

3    psychologist from that did the psych evaluation?

4         MR. DELEON:  I think she was up there from the Devils

5    Lake area, Your Honor.  She actually went to the facility and

6    conducted the psych --

7         THE COURT:  Okay.

8         MR. DELEON:  -- evaluation over there.

9         THE COURT:  And do you remember who that person was,

10   Mr. Fly?

11        THE DEFENDANT:  Jocelyn Soderloff (sic), and --

12        THE COURT:  Okay.  Well, I've -- I've got a lot to

13   decipher here, and I'll try to sort it out here within the next

14   few days and decide where we best go from here.  I think it

15   would be helpful to get that evaluation to be able to see what

16   that medical specialist is recommending.  And like the U.S.

17   marshal's representative said, that if that evaluation

18   concludes that you need to go back to Dr. Sethi and get on

19   hormone therapy, then the U.S. marshal is obligated to do that

20   immediately, but --

21        THE DEFENDANT:  Your Honor, I was her first person of

22   this persuasion to -- you know, so she's doing this also under

23   another doctor out of Grand Forks, and she has to consult with

24   that doctor out of Grand Forks to, you know, do these things.

25   And it took her, you know, several months to actually get -- go

1    through this process that should have been done in a day, and,

2    you know, it keeps putting these things farther and farther and

3    farther --

4         THE COURT:  It's a little more complex than being

5    able to make a decision in one day about what needs to be done.

6         THE DEFENDANT:  Yeah, but the only thing that we're

7    trying to look for is -- and, you know, Dr. Sethi does not even

8    need that under ICD-10.  All he needs to --

9         THE COURT:  Under what?

10        THE DEFENDANT:  ICD-10.  It's an endocrinologist

11   guideline.

12        THE COURT:  Okay.

13        THE DEFENDANT:  He -- he's going by, you know, what

14   he thought was DSM-IV, but now there's DSM-V out.  And DSM-IV

15   did not include intersex people, actually, and --

16        THE COURT:  So why didn't Dr. Sethi prescribe

17   medications at the time that you saw him?

18        THE DEFENDANT:  Because he was looking at the DSM-IV,

19   and he's kind of new to this too --

20        THE COURT:  All right.

21        THE DEFENDANT:  -- but -- and actually a lot of

22   people in North Dakota are really unfamiliar with this kind of

23   situation, and he feels really hard-pressed from the marshals

24   too because they're -- they've been -- in most part it seems

25   that they've been dissuading doctors from helping me and giving

1  me proper care and -- you know, and in wording that they say to

2  them. You know, and it's just fact that they have done it all

3  over the country that way.

4         You know, and there's certain people that are --

5  maybe have certain discrimination against a person like me and

6  they take that discrimination into their own opinions and place

7  their own opinions upon other people who might be trying to

8  treat you and then influence them in that manner. And, you

9  know, once again, if I were here in Bismarck, I'd be closer to

10  actual medical care, that I could be taken care of. They would

11  be more --

12         THE COURT: Or Grand Forks or Fargo or --

13         THE DEFENDANT: You know, one of the --

14         THE COURT: -- Minot.

15         THE DEFENDANT: -- bigger places, and the -- you

16  know, I'm closer to where my lawyer can actually come and let

17  me go over discovery and go over those issues so that I can

18  have a fair trial. I'm not -- you know, I'm pretty darn sure I

19  can't even have a fair trial if I can't go over my discovery.

20         And, you know, I have to be inflicted with severe

21  pain and emotional distress all the time, and the only thing I

22  can think about is all the stress and pain I'm going through

23  from the cold and, you know, the -- being hormonal and, you

24  know, being menopausal and things like that. It's really

25  causing severe problems with me and high anxiety, you know, and

37

1    then when they come in and bother me about my clothes.

2         And then like today I didn't eat, and I have

3    hypoglycemia.  I'm supposed to have in-between-meal snacks,

4    which I have a prescription right here for from the facility

5    from Dr. Milazzo, and they haven't been prescribing -- you

6    know, providing me with that, and I'm supposed to eat every two

7    hours.  I've -- I have fainting spells where I just can fall

8    out and faint.

9         And, you know, these Raynaud's issues where I'm in

10   that really cold room, I -- it feels like it's probably like 50

11   degrees in there.  It may be 60 or 70 degrees in the rest of

12   the facility, but in that room and in the female rec room where

13   they have me going, it's very cold.  And when they come and

14   just up and take my blankets because they think it's warm --

15   you know, they don't have my condition, and they don't know

16   what it's like to have this.

17            THE COURT:  Right.

18            THE DEFENDANT:  And I'm not supposed to be in an

19   air-conditioned room.  They need to put duct tape or cardboard

20   and tape the ducts so that air -- air conditioning don't come

21   and blow in on me in that room.  And then, you know, things

22   wouldn't be bad in that effect right there for that place,

23   but --

24            THE COURT:  All right.  Juan, did this clinical

25   psychologist communicate to you when this evaluation is going

38

1    to be -- the report is going to be issued?

2          MR. DELEON:  She said it could be a week or two

3    weeks, Your Honor.

4          THE COURT:  Okay.

5          MR. DELEON:  And, Your Honor, for the record, to my

6    knowledge, we have not received any documentation where it says

7    he was on a -- or the defendant was on any hormone therapy.

8    And when the defendant actually goes and talks to the nurses,

9    always says the same story about he was doing his hormone

10   therapy in Mexico, so there's no actual medical documentation

11   of the individual ever being on hormone therapy.

12         THE COURT:  Mr. Fly, is there such documentation that

13   reflects that you've been ordered by a physician to get on a

14   hormone therapy program?

15         THE DEFENDANT:  We've been -- like I said, we've been

16   attempting to get a hold of that.  But according to their

17   policy, which is right here that the Transgender Law Center had

18   sent me -- and this, once again, is from the Department of

19   Justice, and the marshals are supposed to follow this, that

20   even if a person has no documentation or they previously were

21   not on that therapy, they're supposed to be given the

22   opportunity to have that therapy, and --

23         THE COURT:  What's the name of that report or that --

24         THE DEFENDANT:  I'm -- it's --

25         THE COURT:  -- that you're holding so I can look at

1    it?

2              THE DEFENDANT:  Number 5200.04.

3              THE COURT:  Say that again.

4              THE DEFENDANT:  Program Statement 5200.04, and then

5    attached with it -- or it's dated January 18th, 2017, so it's

6    fairly recent.

7              THE COURT:  Issued by the Department of Justice?

8              THE DEFENDANT:  Issued by the Department of Justice,

9    yes, Your Honor.

10             THE COURT:  How many pages is the report?  I mean, I

11   can probably look it up online, but --

12             THE DEFENDANT:  Roughly about 40-plus pages.  But it

13   has a form on here because the hormone treatments are off-label

14   by the FDA.  It has a form on here for me to sign that says

15   that I approve myself for taking these and that -- also that

16   there's an identifier form on here that, you know, I can give

17   to them that says, hey, I identify this way and I wish to be on

18   this.  And, you know, this has all the guidelines drawn out

19   right in this.

20             THE COURT:  All right.  Well, I'll look it up and

21   I'll read it.

22             THE DEFENDANT:  Okay.  Yes, Your Honor.

23             THE COURT:  But I need to wrap this up.  I've got

24   other commitments, so I will take the matter under advisement,

25   Mr. Fly.  I'm going to pull up today this program statement and

1    read it and see if there are obligations that the Department of

2    Justice has mandated for the U.S. Marshal Service to comply

3    with.

4              And, Mr. Bellmore, what's the likelihood of this case

5    going to trial on July 17th?

6              MR. BELLMORE: Well, I believe there's a trial that

7    was intended on going on that date that's outside of my office.

8              THE COURT: Okay.

9              MR. BELLMORE: That would be the *United States versus*

10   *Fallis*, I believe. I was kind of told that.

11             THE COURT: Oh, okay.

12             MR. BELLMORE: What we're waiting on here is --

13             THE COURT: Okay.

14             MR. BELLMORE: -- with the -- with the nature -- with

15   the nature of the single charge, the allegation is there was a

16   child produced from this relationship. And so what's happening

17   is there's been some paternity tests, DNA tests that are

18   undergoing. I speak on behalf of the United States, but they

19   attempted to do that at a local -- at the State laboratory.

20   And due to the possibility of this being an incestuous

21   relationship, it complicates the testing as far as paternity

22   goes, so it was sent to FBI laboratory in Quantico, Virginia,

23   and we're waiting on those results.

24             Now, if those -- depending on how those come back,

25   you know, mitigating evidence, if there is no paternal

1    relationship with Mr. Fly and this -- and this -- and this

2    child -- if it's the other way and it does establish the

3    existence of a relationship, you know, we may be in a position

4    where we need to at least contract with an expert who can help

5    us explain some of the science, and --

6         THE COURT:  So do the parties know when the FBI will

7    complete their analysis?

8         MR. BELLMORE:  I don't --

9         MR. GREENLEY:  If I may, Your Honor, the State lab

10   had to contract with Bode Cellmark.  Neither the North Dakota

11   State Lab nor the FBI lab have the capabilities of doing a

12   kinship analysis where you've got the father and the -- and the

13   mother related.  We've sent -- we've made that request.  We

14   paid for the request.  I'm going to try to hurry along

15   Cellmark.  Our original anticipated result was this June, and

16   we hope to have it very soon, Your Honor.

17        THE COURT:  All right.  Well, thank you.  Thank you,

18   Mr. Fly, for your comments here today, and we will stand in

19   recess.

20        THE DEFENDANT:  Thank you, Your Honor.

21        (Proceedings concluded at 11:57 a.m., the same day.)

22                    - - - - - - - - - -

23

24

25

1                  CERTIFICATE OF COURT REPORTER

2          I, Sandra E. Ehrmantraut, a Certified Realtime

3   Reporter,

4          DO HEREBY CERTIFY that I recorded in shorthand the

5   foregoing proceedings had and made of record at the time and

6   place hereinbefore indicated.

7          I DO HEREBY FURTHER CERTIFY that the foregoing

8   typewritten pages contain an accurate transcript of my

9   shorthand notes then and there taken.

10         Dated:  March 12, 2018

11

12                    /s/ Sandra E. Ehrmantraut

                    Certified Realtime Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25