UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NORTH DAKOTA


USA,                          )
                              )
            Plaintiff,        )
                              )
        vs.                   )        File No. 1:16-cr-00244-DLH-1
                              )
William Anthony Fly,          )
                              )
            Defendant.        )


TRANSCRIPT OF SENTENCING HEARING


Taken at
United States Courthouse
Bismarck, North Dakota
February 26, 2018


BEFORE THE HONORABLE DANIEL HOVLAND
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

Matthew Greenley
Attorney at Law
Federal Building
220 E. Rosser Avenue, Room 372
Bismarck, North Dakota  58501
                                For the United States.

Chris Bellmore
Attorney at Law
Federal Plaza
324 North 3rd Street, Suite 1
Bismarck, North Dakota  58501
                                For the Defendant.

                   ---------------

Government Witnesses:                                    Page No.
CANYA FLY
        Direct Examination By Mr. Greenley                  6
        Cross-Examination By Mr. Bellmore                   20
        Redirect Examination By Mr. Greenley               36
        Recross-Examination By Mr. Bellmore                37

BRENDA TOWNSEND
        Direct Examination By Mr. Greenley                 40
        Cross-Examination By Mr. Bellmore                  47

AMY CHANDLER
        Direct Examination By Mr. Greenley                 49
        Cross-Examination By Mr. Bellmore                  55

EXHIBITS

No.        Description                                 Page No.

1          DNA Report (Sealed)                            54

CONTENTS

Statements
        Canya Fly                                          74
        Tiffany Fly                                        77
        Brenda Townsend                                    79
        Zelda Fly                                          80

Sentence Recommendations
        Mr. Greenley                                       82
        Mr. Bellmore                                       83

Closing Statement by Defendant                             88

Court's Ruling                                            105

1              (THE FOLLOWING PROCEEDINGS WERE HAD AND MADE OF

2     RECORD, AS FOLLOWS, on February 26, 2018, commencing at 1:30

3     p.m.)

4              ---------------

5              THE COURT:  Good afternoon.  We will open the record

6     in the case of United States of America versus William Fly.

7              Here on behalf of the Federal Government is Assistant

8     US Attorney Matthew Greenley.  Representing the defendant here

9     is Attorney Chris Bellmore from the Federal Public Defender's

10    Office.

11             Mr. Fly, how are you today?

12             THE DEFENDANT:  Much better where I'm at, Your Honor.

13             THE COURT:  This is scheduled as a sentencing hearing

14    on a charge of transportation with intent to engage in criminal

15    sexual activity.

16             Before today I have reviewed the presentence

17    investigation reports, twice.  I've looked at the defendant's

18    sentencing memorandum and sentencing memorandum supplement,

19    twice.  I've reviewed the applicable sentencing guidelines.

20    I've read a few letters that were submitted.  Gone back and

21    reviewed the charge and the plea agreements.

22             Had the Government submitted a sentencing memorandum?

23             MR. GREENLEY:  I haven't, Your Honor.

24             THE COURT:  All right.  Is there anything else that

25    was submitted that I did not identify?

1          MR. GREENLEY:  I don't believe so.

2          MR. BELLMORE:  No, Your Honor.

3          THE COURT:  All right.  Mr. Fly, were you given the

4    opportunity to review the presentence investigation report?

5          THE DEFENDANT:  Last Friday, Your Honor.

6          THE COURT:  Pardon?

7          THE DEFENDANT:  Last Friday, Your Honor.  Yes.

8          THE COURT:  All right.  And you've discussed that

9    report with your attorney?

10          THE DEFENDANT:  Somewhat, yes.

11          THE COURT:  All right.  I know there have been some

12    objections to the sentencing guideline calculations, and we'll

13    deal with all of those, but relative to the advisory sentencing

14    guidelines, is there evidence that either party intends to

15    submit testimony of witnesses?  Am I to address those

16    guidelines?

17          MR. GREENLEY:  I would like to submit some testimony,

18    Your Honor.  Canya Fly, the victim in the case, I would like to

19    call her to testify; she would also have a statement to address

20    to the Court.  I'd like to call Tiffany Fly, her mother,

21    briefly for testimony; she also has a victim impact statement.

22    I would like to call Brenda Townsend briefly, she is what we

23    identify as a 413 witness; she also has a victim impact

24    statement, Your Honor.  I'd like to call Amy Chandler briefly,

25    mostly to provide some foundation to offer the Court the DNA

1  analysis report that was done in this case.  And my objective

2  would be to keep it as brief as possible.

3            THE COURT:  All right.  Mr. Bellmore, do you have any

4  witnesses that you intend to testify?

5            MR. BELLMORE:  No, I don't, Your Honor.

6            THE COURT:  All right.  Well, we'll hear from the

7  witnesses first and then we'll address the sentencing

8  guidelines before I give everyone an opportunity to outline

9  what their sentencing recommendations are; so let's hear from

10  the witnesses first.

11            MR. GREENLEY:  As a matter of procedure, Your Honor,

12  when we're done with direct and cross-examination, would you

13  like the witness to remain on the stand and read the impact

14  statements or have them testify at a later time?

15            THE COURT:  I think we can do it all at the same

16  time.  Sure.

17            MR. GREENLEY:  Thank you.  I'd like to call Canya

18  Fly.

19                      CANYA FLY,

20  called as a witness, being first duly sworn, was

21  examined and testified as follows:

22                  DIRECT EXAMINATION

23  BY MR. GREENLEY:

24  Q.       Ms. Fly, would you please state your name and spell

25  your name for the record?

1    A.        Canya, C-A-N-Y-A F-L-Y.

2    Q.        How old are you?

3    A.        I'm 20.

4    Q.        Where do you live right now?

5    A.        Rugby.

6    Q.        And is it true that you were in Kansas until

7    recently?

8    A.        Yes.

9    Q.        What were you doing down in Kansas?

10    A.        I was going to Job Corps.

11    Q.        How is that going?

12    A.        Great.  I completed the program.

13    Q.        Who do you live with in Rugby?

14    A.        My mom and family.

15    Q.        And what's your mom's name?

16    A.        Tiffany.

17    Q.        Do you have any siblings?

18    A.        Yes.

19    Q.        And are you the oldest in the family?

20    A.        No.

21    Q.        Who's the oldest?

22    A.        Well, I have half siblings that actually live in

23    California, so -- but the ones that live with my mom, that

24    would be my older brother Xylan, he is 21.

25    Q.        Okay.  And then you?

1    A.        Yes.

2    Q.        And then who's next?

3    A.        Dillion, he just turned 18, and then Zelda, she's 14.

4    Q.        Okay.  Who's the youngest?

5    A.        Zelda.

6    Q.        And how many half siblings do you have?

7    A.        Four.

8    Q.        And are they all in California?

9    A.        No.

10   Q.        Have you met them?

11   A.        I've met a few of them.

12   Q.        And they're all older than you; correct?

13   A.        Yes.

14   Q.        Can you give the Court an idea of where you've lived

15   throughout your childhood?

16   A.        All over.

17   Q.        Okay.  What do you mean by all over?

18   A.        We traveled a lot.

19   Q.        Okay.  What states have you lived in?

20   A.        Arizona, California, Utah, Idaho, New Mexico, Oregon,

21   basically this side of the world -- of the states.

22   Q.        The western US?

23   A.        Yes.

24   Q.        And have you lived in other cities in North Dakota?

25   A.        Yes.  We lived in Williston and Dickinson.

1    Q.        Did you go to school through all these moves?

2    A.        Yes.  I was also homeschooled.

3    Q.        For the whole time?

4    A.        No.  I was homeschooled for a year.  I just got out

5    of junior year when I was homeschooled.

6    Q.        Just out of junior high school?

7    A.        Yeah.

8    Q.        Have you had any jobs during this time period?

9    A.        Yes, I've had a job since I was 14.

10   Q.        Where did you work?

11   A.        I cashiered at a Leevers Foods in Rugby, and I worked

12   at a Cenex C-store; I worked at a Marketplace in Minot on north

13   hill; I worked in the fitting room at Walmart in Dickinson; and

14   I worked at the McDonald's in Dickinson too.

15   Q.        Before the incidents in this case, had you ever lived

16   on your own?

17   A.        Other than going to Job Corps, no.

18   Q.        Did you ever make enough money at any of those jobs

19   to support yourself?

20   A.        I could have but I wasn't old enough to live on my

21   own at the time.

22   Q.        When you lived with your parents, do you believe that

23   they had influence about what you could do and what you could

24   not do?  Like if you're living in their house, do their rules

25   go?

1   A.         I never really was allowed to go anywhere unless I,

2   like, did a chore.

3   Q.         Okay.  That's what I was getting at.  Do you feel

4   like you were dependent on your parents?

5   A.         My mom.

6   Q.         Okay.  Even when you were 18?

7   A.         Yeah.

8   Q.         And it was after this happened, in this case, that

9   you moved to Job Corps?  After the incidents that were charged

10  here, after your pregnancy, that's when you moved to Job Corps

11  for the first time?

12  A.         Yes.

13  Q.         Okay.  Who's your father?

14  A.         William Anthony Fly.

15  Q.         And he's the person next to Chris Bellmore?

16  A.         Yes.

17  Q.         What was your father like growing up?

18  A.         Manipulative.

19  Q.         You said manipulative?

20  A.         Yes.

21  Q.         Did he get his way in the house?

22  A.         Always.

23  Q.         And, I guess, as an initial matter, I call him "he."

24  Had your father always held himself out to be a man?

25  A.         Yes, Your Honor.

1    Q.        Did he always -- well, I'm not Your Honor.  Did he

2    always wear men's clothing?

3    A.        Yes.

4    Q.        Did he ever pretend or hold himself out to be a

5    woman?

6    A.        No.

7    Q.        At least up until the events here, that we're talking

8    about today, you never knew him to be a woman?

9    A.        No.

10   Q.        Now you listed a number of jobs for the Court, did

11   you ever work for your father?

12   A.        I didn't work for him but I helped him.  Like, I

13   would drive behind him.

14   Q.        Okay.  So what was the job that he was doing that you

15   would help him with?

16   A.        He went and picked up cars and -- in, like, different

17   states and I would follow him behind.

18   Q.        And what did he do with those cars?

19   A.        He'd transport them to that particular business.

20   Q.        Do you know what the company that he worked for is

21   called?

22   A.        AmeriFleet.

23   Q.        AmeriFleet?

24   A.        Yeah.

25   Q.        So he would go from -- he would pick up a vehicle in

```
1   one city and then he would drive it to wherever it had to go,
2   another city?
3   A.        Yes.
4   Q.        And then what would happen once you got there with
5   him in the new city?
6   A.        We -- it would depend on, like, how we're feeling, if
7   we're tired or not, and he would get a hotel room.
8   Q.        Okay.  So you might stay somewhere for a night?
9   A.        Yes.
10  Q.        And what would happen the next day?
11  A.        The next day he would do stuff to me.
12  Q.        Okay.  But for his job would you pick up another car
13  and drive to yet another city?
14  A.        Yes.
15  Q.        So he was shuffling these vehicles all around the
16  United States?
17  A.        Yes.
18  Q.        And your role is you would follow him in your
19  personal vehicle?
20  A.        Yes.
21  Q.        And why was that necessary?
22  A.        It wasn't really necessary.
23  Q.        Okay.
24  A.        But financially it was a help.
25  Q.        So at the end of a series of moves, he would want to
```

1   return home; right?

2   A.          Yes.

3   Q.          And is that where you would help him, by giving him a

4   ride home?

5   A.          Yes.

6   Q.          Which is something he could have accomplished with a

7   bus pass?

8   A.          Yes.

9   Q.          Or you could have gone and picked him up at the end

10  of the trip?

11  A.          Yeah.

12  Q.          But he had you follow him around?

13  A.          Yes.

14  Q.          What happened when you had to stay the night?

15  A.          Like in a hotel room?

16  Q.          Yes.

17  A.          He would make me watch porn.  And he would hold me

18  down and do the sexual assault; stick his dick inside me.

19  Q.          Okay.  And you mean vaginal sex?

20  A.          Yes.

21  Q.          Did he do anything else?

22  A.          He'd touch my boobs and my butt.  And he would tell

23  me that he was going to marry me, and I'm going to have his

24  children.  And he would hit me with a cord and hanger, belts,

25  his hand sometimes.

1   Q.        Did he say why he hit you?

2   A.        No.

3   Q.        Did he want something when he hit you?

4   A.        He wanted to have sex.

5   Q.        So he was making you submit?

6   A.        Yes.

7   Q.        Did he ever do anything else with the cords?

8   A.        Huh?

9   Q.        What did you say he hit you with?  Belts?

10  A.        Belts, cords, hangers, and his hand.

11  Q.        Did he only use those things to hit you?

12  A.        Yeah.

13  Q.        Okay.  How long did he have this AmeriFleet job?

14  A.        I don't know.

15  Q.        Was it a year or less than a year?

16  A.        He's been working for different companies over the

17  past couple years.

18  Q.        All right.  As far as you helping him and following

19  him on these trips, how long had that been going on?

20  A.        I don't know the exact number.

21  Q.        Would you say those trips were about a year or was it

22  more than a year?

23  A.        It was about a year.

24  Q.        How many times did he sexually assault you?

25  A.        A lot.

1    Q.        Did he use a condom or did he have protection when

2    you had sex?

3    A.        No.

4    Q.        Now looking specifically at July of 2016, did you go

5    to the doctor at that month?

6    A.        Yes.

7    Q.        Why did you go to the doctor?

8    A.        I had been sick for, like, three months.  And I had a

9    severe headache and I kept puking.  And so my mom made me a

10   doctor appointment.  And we went in and they took a blood test,

11   and it came up positive for pregnancy.

12   Q.        Were you expecting that?

13   A.        No.

14   Q.        Who was the father?

15   A.        William Anthony Fly.

16   Q.        Could it have been anybody else?

17   A.        No.

18   Q.        Because you didn't have sex with anyone else during

19   that time?

20   A.        No.

21   Q.        When was that baby born?

22   A.        January 13, 2017.

23   Q.        And that's Mason?

24   A.        Yes.

25   Q.        And he's here today?

1  A.        Yes.

2  Q.        Was he a full-term baby?

3  A.        Yes.

4  Q.        Did any of these assaults that you were talking

5  about, did they happen in April or May of 2016?

6  A.        Yes.

7  Q.        And did they happen inside the State of North Dakota,

8  these assaults where you were following your father around

9  and --

10  A.        No.

11  Q.        They happened in states outside of North Dakota?

12  A.        Yes.

13  Q.        Now, outside of this period of time, with AmeriFleet,

14  has your father ever assaulted you sexually?

15  A.        Yes.

16  Q.        When did it begin?

17  A.        When I was nine.

18  Q.        What do you remember about it beginning?

19  A.        He just pulled me into a room and pulled off my pants

20  and started playing with me.

21  Q.        Did he ever do anything to stop you from telling

22  anyone?

23  A.        Yeah.

24  Q.        What did he do?

25  A.        He told me that he was going to hurt my family and

1  kill them.

2  Q.        And, in fact, you didn't tell anyone?

3  A.        No.

4  Q.        You never told anyone until you found out you were

5  pregnant?

6  A.        Yes.

7  Q.        Did he make any of those threats more recently, like

8  on those trips when he was working for AmeriFleet?

9  A.        Yes.

10  Q.        What do you remember him threatening you with?

11  A.        Cords.

12  Q.        The cords?

13  A.        And the belt.

14  Q.        And how about the words?

15  A.        (Witness nods.)

16  Q.        You have to answer out loud.  I'm sorry.

17  A.        Yes.

18  Q.        And what was it that he said recently?

19  A.        I'm sorry.  What did you say?

20  Q.        Did he threaten to kill you during those AmeriFleet

21  trips?

22  A.        Yes.

23  Q.        Did he threaten to kill other members of your family

24  during those trips?

25  A.        Yes.

1  Q.        If you told anyone?

2  A.        No.

3  Q.        Okay.  Was he saying the threats to get you to do

4  things or to prevent you from telling people?

5  A.        Both.

6  Q.        This may seem like a strange question, but is this

7  anything you had wanted ever?

8  A.        No.

9  Q.        Did you ever tell him no?

10  A.        Yes.

11  Q.        Did you ever struggle with your father?

12  A.        Yes.

13  Q.        How many times has this happened throughout your

14  life?

15  A.        Too many to count.

16  Q.        After this case was charged or -- I take that back.

17  When this was being investigated, when you met with Special

18  Agent Chandler, did your father say anything to you?

19  A.        Yes, he wrote me messages on Facebook.

20  Q.        Was that a typical way for him to communicate with

21  you?

22  A.        Yes.

23  Q.        What kind of messages did he write you?

24  A.        He told me that we could go to Idaho to visit my, at

25  the time, boyfriend and he would marry me off to him.

1   Q.        Did he say anything about what you should tell the

2   FBI?

3   A.        He wanted me to lie to the cops and tell them that

4   all this was false.

5   Q.        How frequently was he sending messages to you?

6   A.        Dozens.

7   Q.        Dozens total?

8   A.        A day.

9   Q.        Dozens of messages a day?

10  A.        Yeah.

11  Q.        And what were most of them about?

12  A.        How much he loves me and that we can go away and

13  start a new life together somewhere, basically run away from

14  this.

15  Q.        And what did he want you to do to make that happen?

16  A.        Lie.

17  Q.        Did he ever write you a message about whether or not

18  he forced you to do anything?

19  A.        Yes.

20  Q.        What did he write?

21  A.        I can't remember.  But I know it said, like, I didn't

22  force you to do any of this.

23  Q.        Now as part of this investigation, did Special Agent

24  Chandler collect a DNA sample from you?

25  A.        Yes.

1   Q.        It was like a cheek swab?

2   A.        Yeah.

3   Q.        And did she get one from your son as well?

4   A.        Yes.

5   Q.        As far as driving for AmeriFleet, did you ever see if

6   your father could get somebody else to do it?

7   A.        Yes.

8   Q.        Who else did you suggest?

9   A.        My mother and my brother.

10  Q.        And what was his response?

11  A.        My brother's response was no, and my mom said that

12  she couldn't because she had to stay home with my sister who

13  was underage.

14  Q.        And they didn't know what was happening, did they?

15  A.        No.

16            MR. GREENLEY:  I have no further questions on direct,

17  Your Honor.

18            THE COURT:  Mr. Bellmore.

19            MR. BELLMORE:  Thank you, Your Honor.

20                    CROSS-EXAMINATION

21  BY MR. BELLMORE:

22  Q.        Canya, you spoke to law enforcement several times

23  when this case was being investigated?

24  A.        Yes.

25  Q.        In fact, I count four that I have records of, does

1   that sound about right?

2   A.        What?

3   Q.        Four times you've been interviewed by law

4   enforcement.

5   A.        I don't know.

6   Q.        Okay.  Well, the first time, I believe, took place in

7   July when you were at the doctor's office when you learned you

8   were pregnant?

9   A.        Yes.

10  Q.        You spoke to a social worker?

11  A.        Yes.

12  Q.        Her name was Melinda?

13  A.        Mm-hmm.

14  Q.        Is that a yes?

15  A.        Yes.

16  Q.        Okay.  Do you remember that she asked you what had

17  happened between you and your father?

18  A.        Yes.

19  Q.        And that's when you revealed that you believed that

20  your father was the father of your baby?

21  A.        Yes.

22  Q.        Okay.  And during that first interview the social

23  worker asked you what had happened?

24  A.        Yes.

25  Q.        About whether or not you were threatened?

```
 1   A.         Yes.

 2   Q.         Whether or not you were physically harmed?

 3   A.         Yes.

 4   Q.         But during that conversation you never mentioned your

 5   father using a cord?

 6   A.         Yes.

 7   Q.         Yes what?

 8   A.         I didn't mention that.

 9   Q.         You did not mention that.  You also didn't mention

10   that your father used a belt on you?

11   A.         Yes, I didn't mention that either.

12   Q.         You also didn't mention that your father used his

13   hands to assault you or try to scare you into having sex?

14   A.         I didn't mention that.

15   Q.         Okay.  In fact, during that first conversation when

16   you were asked about a threat, you mentioned an incident that

17   happened in Minot three years prior where your father had

18   threatened to kill your mother?

19   A.         Yes.

20   Q.         Okay.  And so as we sit here in 2018, that would have

21   been about five years ago when that would have taken place?

22   A.         Yes.

23   Q.         And these incidents took place about -- could we say

24   two and a half years ago now?

25   A.         Yes.
```

1    Q.        So this was prior in time before these AmeriFleet

2    trips?

3    A.        Yes.

4    Q.        And you described an incident in Minot where your

5    father tried to make an advance on you in a church parking lot?

6    A.        Yes.

7    Q.        And you told Melinda that you were told by your

8    father that if it didn't happen, he was going to kill your

9    mother?

10    A.        Yes.

11    Q.        And your response was, you told your father that you

12    needed to eat?

13    A.        Yes.

14    Q.        And so you went to Rugby, back home to Rugby?

15    A.        No.  We lived in Minot at that time.

16    Q.        But you went home that day, once you told your father

17    that you needed to eat and you needed to get home?

18    A.        I begged him.

19    Q.        Okay.  Your mother was never harmed?

20    A.        No.

21    Q.        During that first meeting with the social worker at

22    the clinic, you told the worker that you became pregnant in

23    Virginia?

24    A.        Not Virginia.

25    Q.        You didn't say Virginia?

1   A.      No.

2   Q.      Are you sure about that?

3   A.      I said Arkansas.

4   Q.      I think we can agree, jumping ahead a little bit,

5   that it didn't take place in Virginia; correct?

6   A.      I don't know.

7   Q.      Let's go from the beginning of these AmeriFleet

8   trips.  When, do you remember, did your father start driving

9   cars for AmeriFleet?

10  A.      A couple years ago.

11  Q.      Okay.  Well, back -- this took place in 2016, all of

12  the events we're talking about here today; correct?

13  A.      Yes.

14  Q.      So would you agree with the statement that he started

15  working with AmeriFleet in March of 2016?

16  A.      Probably for that company.

17  Q.      Okay.  And your first trip you took with your father

18  took place in April of that year, 2016?

19  A.      My first trip?

20  Q.      Yes.

21  A.      I don't know.

22  Q.      Well, what was the first trip you took with your

23  father to transport these cars?

24  A.      I don't remember.

25  Q.      Do you ever remember going to Eden Prairie to drop

1  off a car?

2  A.        What?

3  Q.        Eden Prairie, Minnesota to drop off a car.  Do you

4  remember doing that?

5  A.        Yes.

6  Q.        Okay.  You picked it up in Bismarck?

7  A.        Yes.

8  Q.        From Rugby?

9  A.        We took my personal car, yeah.

10  Q.        From Rugby to Bismarck?

11  A.        Yes.

12  Q.        Your father picked up a car in Bismarck?

13  A.        Yes.

14  Q.        And you drove it to Minnesota?

15  A.        Yes.

16  Q.        And then you went back and forth a little bit between

17  Grand Forks and Minnesota?

18  A.        Yes.

19  Q.        My understanding is that's the first trip, would you

20  disagree with that?

21  A.        No.

22  Q.        Okay.  And you didn't stay in a hotel at that time?

23  That trip between North Dakota and Minnesota, you didn't stay

24  in a hotel?

25  A.        No.

1    Q.        You just went back and forth until you were finished

2    and transported the cars and went back home to Rugby?

3    A.        Yes.

4    Q.        Okay.  Would you dispute that that took place about

5    April 22 of 2016?

6    A.        What are we talking about?

7    Q.        We're talking about the trip that you made, the first

8    trip with your father when you transported cars from Rugby to

9    Bismarck to Minnesota and back.

10   A.        No.

11   Q.        No what?

12   A.        It didn't happen that day.

13   Q.        I'm asking do you believe that that could have

14   happened on or about April 22 of 2016?

15   A.        We were in Arkansas at that time.

16   Q.        That's not what your Facebook records show, Canya.

17   A.        I don't remember.

18   Q.        How many trips did you go on with your father?

19   A.        A lot.

20   Q.        What if it was in the neighborhood of 12, does that

21   sound right?

22   A.        Maybe.

23   Q.        When you went to Texas, that was on the border of

24   Texas and Arkansas?

25   A.        Texarkana.

1   Q.        And you stayed in a hotel on that trip?

2   A.        Yes.

3   Q.        How many different states did you stay in on that

4   trip, going all the way down to Texas?

5   A.        Huh?

6   Q.        Let me ask it this way, how long did it take you to

7   get to North Dakota from Texas?

8   A.        I don't remember.

9   Q.        Did you make it in one day?  Did it take a couple

10  days?

11  A.        A couple.

12  Q.        Do you remember where you stayed before you got to

13  Texas?

14  A.        Best Western.

15  Q.        What city?

16  A.        We stayed at Texarkana.

17  Q.        Right.  And that's what I'm understanding is you're

18  saying that's possibly one of the places where there was a

19  sexual encounter with your father?

20  A.        Yes.

21  Q.        And that's when you're saying that's likely where

22  your child was conceived?

23  A.        Yes.

24  Q.        But you don't remember any of the other hotels that

25  you stayed at along the way?

1   A.        No.

2   Q.        Safe to say that nothing memorable or substantial

3   happened during those other hotel trips on your way to

4   Texarkana?  Because, Canya, I have details of two times that

5   you've alleged that your baby could have been conceived, one

6   was in Virginia and one was Texarkana.  Do you remember telling

7   the FBI and telling other law enforcement agencies that that's

8   possibly where the baby was conceived?

9   A.        Yes.

10  Q.        Okay.  So I'm just trying to get some details about

11  what happened along those trips.  I'm not going to go through

12  every trip.  I'm just trying to figure out what happened on

13  that trip to Texarkana because that's a long ways away from

14  Rugby.  Would you agree?

15  A.        Yes.

16  Q.        Okay.  So safe to say that nothing memorable, or

17  whatever abuse has happened, from North Dakota to Arkansas?

18  A.        Stuff would happen in the car, we stayed in the car

19  sometimes.

20  Q.        But you can't tell me any dates or?

21  A.        No.

22  Q.        Okay.  Do you remember on any of these trips, any of

23  these trips, where your father was pulled over?

24  A.        Yes.

25  Q.        For speeding maybe?

1   A.         Yeah.

2   Q.         Do you remember where that was?

3   A.         No.

4   Q.         Could that have been in Texarkana?

5   A.         Maybe.

6   Q.         Okay.  Around that time frame do you remember going

7   to that part of the country, Texarkana -- excuse me.  Let me

8   rephrase that.  Do you remember your father going to Texarkana

9   during that time frame without you?

10  A.         No.

11  Q.         And remember I'm talking about March until July.

12             THE COURT:  Of 2016?

13             MR. BELLMORE:  Yes, Your Honor.

14             THE COURT:  All right.

15  A.         No.

16  Q.         He was pretty much with you that entire time during

17  those months; correct?

18  A.         Yes.

19  Q.         Okay.  So if I have a traffic ticket from Texarkana

20  from May of 2016, that's when he would have been with you?

21  A.         Yeah.

22  Q.         I'm sorry.  Is that a yes?

23  A.         Yes.

24  Q.         I'm not trying to trick you on details, Canya.  But

25  I'm just trying to make sure that we get some of these dates

1  down.  Okay?

2  A.         (Witness nods.)

3  Q.         All right.  So all that being said, it's fair to say

4  that you could have been in Texarkana in May?

5  A.         Yes.

6  Q.         And you went on a trip to Virginia though; correct?

7  A.         Yes.

8  Q.         All of these AmeriFleet trips?

9  A.         Yes.

10  Q.         And you went with one of your brothers?

11  A.         Yes.

12  Q.         And that was Xylon?

13  A.         Xylan.

14  Q.         Xylan.  Excuse me.  He's your oldest brother?

15  A.         Yes.

16  Q.         And that could have happened in May, too; right?

17  A.         Maybe.  I don't know.

18  Q.         Did you see some family when you were on that trip to

19  Virginia?

20  A.         It wasn't in Virginia, it was in North Carolina.

21  Q.         Who did you go see?

22  A.         A cousin.  My cousin Heather and her children.

23  Q.         Was Xylan in college at that time?

24  A.         No.

25  Q.         Was he enrolled in school at that time or was he on

 1   break?

 2   A.        Neither.

 3   Q.        He wasn't going to school?

 4   A.        No.

 5   Q.        And that's -- I want to be clear.  You have access to

 6   a telephone on these trips?

 7   A.        Yes.

 8   Q.        A cell phone?

 9   A.        Yes.

10   Q.        And you had -- it was a smart phone?

11   A.        Yes.

12   Q.        So you could talk on Facebook?

13   A.        Yes.

14   Q.        Is that how you sent most of your messages to friends

15   and family, was on Facebook?

16   A.        Yes.

17   Q.        Just through the messenger thing, not posts; right?

18   A.        Yeah.

19   Q.        Would you send pictures back home when you were on

20   these trips?

21   A.        Yes.

22   Q.        Do you remember sending a bunch of photos to your

23   mother about a fancy car that you were driving around in

24   Minnesota?

25   A.        Yes.

```
 1   Q.        What was unique about it?
 2   A.        I wasn't actually driving it, my father was but I sat
 3   in the driver's seat to take pictures.  And it's like a brand
 4   new car and it had one of those starters where you can just
 5   turn it and it would just startup (indicating) and had the
 6   whole entire roof (indicating) of the car you can see out, and
 7   there was heated seats.
 8   Q.        Okay.  Do you remember taking pictures of the car,
 9   though, and sending them to your mom?
10   A.        Yes.
11   Q.        Do you remember what date that was?
12   A.        No.
13   Q.        Would it help if I showed you some of those pictures
14   to look at those dates?  Would that help refresh your memory?
15   A.        Yes.
16             MR. BELLMORE:  Your Honor, may I approach?
17             THE COURT:  Sure.
18   Q.        Canya, I'm showing you a picture.  Do you recognize
19   that?
20   A.        Yes.
21   Q.        What do we see in the picture?  Not too complicated.
22   Is there a person in the picture?
23   A.        Me.
24   Q.        That's you?  Okay.  And is this the car that you were
25   just describing?
```

1   A.        Yes.

2   Q.        And this is the picture that you remember sending to

3   your mom?

4   A.        Yes.

5   Q.        Okay.  I want to show you the message you sent to

6   your mom.  Do you remember saying these things to your mom,

7   having this conversation?

8   A.        I don't remember.

9   Q.        You recognize the date on there?

10  A.        (Witness nods.)

11  Q.        Can you read what it says?

12  A.        Yeah.

13  Q.        What does it say?

14  A.        4/22/16.

15  Q.        Okay.  When you talked about your son with

16  Mr. Greenley, you mentioned that he was a full-term baby?

17  A.        Yes.

18  Q.        Does that mean that he was carried for 40 weeks?

19  A.        Yes.

20  Q.        And back in July one of the conversations you had, I

21  think with the Rugby Police Officer, you mentioned that the

22  doctor told you you were 12 weeks along?

23  A.        I think it was 13.

24  Q.        Okay.  Did you have -- were you ever told of when the

25  conception date would have been?

1  A.        January 12.

2  Q.        The date of birth but when the baby was conceived?

3  A.        In April.

4  Q.        So would 40 weeks -- I'm not going to have you do the

5  math, but do you have any reason to dispute that 40 weeks from

6  January -- is it 13? -- would be about April 15th to the 21st?

7  A.        I don't know.

8  Q.        If your baby was -- you have a pretty good

9  understanding your baby was likely conceived in April?

10  A.        Yes.

11  Q.        And your first trip, again, on AmeriFleet was to

12  Minnesota in that Volvo, that fancy car?

13  A.        I don't remember that.

14  Q.        The car we just talked about, that trip you took and

15  sent pictures to your mother.

16  A.        No.  I mean, like I don't remember it being the first

17  trip.

18  Q.        What do you remember being the first trip?

19  A.        I don't know.

20  Q.        But that could have been the first trip, you just

21  don't remember?

22  A.        I don't know.

23  Q.        You don't know?

24  A.        I don't.

25  Q.        Okay.  That's a fair answer.  If you don't know,

```
 1   that's okay to say I don't know.  Okay.
 2            You talked about you started working at 14; right?
 3   A.       Yes.
 4   Q.       And I must not have counted.  Do you remember how
 5   many jobs you've had?
 6   A.       Five.
 7   Q.       Have you ever had difficulty getting a job?
 8   A.       No.
 9   Q.       Did you ever live in Rexburg, Idaho without your
10   parents?
11   A.       That was -- yes, but that was not, like, "live on
12   your own" type of situation.  That was "Okay.  We'll be right
13   back in a couple weeks."  So it was like them going back to
14   North Dakota to take my brother home for medical cause they had
15   Medicaid for North Dakota.
16   Q.       Okay.  And so do you know how many -- how long you
17   were there?  Was it weeks?  Was it months?
18   A.       About a month.
19   Q.       Did you live alone?
20   A.       No.
21   Q.       Who stayed with you?
22   A.       My younger sister.
23   Q.       Zelda?
24   A.       Yes.
25   Q.       How old was she at that time?
```

1   A.          11.

2   Q.          Pretty young, wouldn't you say?

3   A.          Yes.

4   Q.          You were responsible for her?

5   A.          Yes.

6   Q.          And you were working at that time too; right?

7   A.          Yes.

8   Q.          Is that at Albertsons?

9   A.          Yes.

10  Q.          Is that a grocery store in Idaho?

11  A.          Yes.

12              MR. BELLMORE:  That's all the questions I have at

13  this time, Your Honor.

14              THE COURT:  All right.  Do you have anything else?

15              MR. GREENLEY:  Very briefly, Your Honor.

16                   REDIRECT EXAMINATION

17  BY MR. GREENLEY:

18  Q.          Canya, you were asked about an interview that

19  occurred in July of 2016 where you didn't mention that your

20  father used his hands or a cord on you.  Do you remember that

21  question?  Your father wasn't in custody at that time, was he?

22  A.          No.

23  Q.          And where was he when you went into the hospital?

24  A.          He went to -- he was on his work trip in Williston, I

25  think.

1  Q.        Was your mother initially upset about hearing the

2  news of your pregnancy?

3  A.        Yes.

4  Q.        Now, just to be clear, you were telling the Court

5  that certainly between February and May of 2016 is when Mason

6  was likely conceived?

7  A.        Yes.

8  Q.        And the AmeriFleet trips happened in about April and

9  May of 2016?

10  A.        Yes.

11  Q.        And on those trips you're testifying that you

12  travelled with your father outside the State of North Dakota at

13  his request; correct?

14  A.        Yes.

15  Q.        And that he raped you at least one of those trips?

16  A.        Yes.

17  Q.        And was Texarkana one of those trips?

18  A.        Yes.

19            MR. GREENLEY:  That's all I have, Your Honor.

20            THE COURT:  Anything else?

21            MR. BELLMORE:  Yes, Your Honor.

22                    RECROSS-EXAMINATION

23  BY MR. BELLMORE:

24  Q.        Canya, you also spoke with the FBI Agent, that's

25  seated next to the prosecutor, in September of 2017; correct?

1    A.        I've spoken to her many times, so I couldn't tell

2    you --

3    Q.        You've spoken -- go ahead.  I'm sorry.

4    A.        I couldn't tell you when I spoke to her in September

5    or not.

6    Q.        You've spoken to her since your dad's been arrested?

7    A.        Yes.

8    Q.        You had a conversation with the FBI once your father

9    was incarcerated?

10   A.        Yes.

11   Q.        Okay.  And you were at Job Corps in Minot for a

12   little bit?

13   A.        Yes.

14   Q.        The FBI come visit you there?

15   A.        Yes.

16   Q.        They asked you to talk about this case?

17   A.        Yes.

18   Q.        Okay.  Did you mention at any time, during that

19   conversation, that your father used cords?

20   A.        I don't remember.

21   Q.        Okay.  Because I have a transcript, Canya, of that

22   conversation and I don't recall seeing anything about you being

23   hurt or threatened with cables, cords, hands, or anything like

24   that.  But would that surprise you to learn that that wasn't

25   something that was addressed in that conversation?

 1   A.          I don't know.

 2   Q.          That seems like something that's pretty important,

 3   Canya.  It's the first time we're hearing it is today, despite

 4   having four conversations.  Do you know why that is?

 5   A.          Because I was scared.

 6   Q.          Of what, though, Canya?  Your father was in jail, was

 7   he not?

 8   A.          Yes.

 9   Q.          Has he tried to talk to you since he's been in jail?

10   A.          Through letters but the FBI stopped him from doing

11   so.

12   Q.          Okay.  They weren't scary letters?

13   A.          No.

14   Q.          He never tried to contact you on the phone?  You

15   never answered your cell phone and it was your dad calling from

16   jail?

17   A.          No.

18   Q.          Okay.  So since he was in jail, has he told you not

19   to testify or not to say anything to the FBI?

20   A.          While he's in jail?

21   Q.          While he's in jail.

22   A.          We had our electronics taken from us.

23   Q.          So he wasn't able to do that then?

24   A.          Correct.

25   Q.          Even if he wanted to?

1    A.        Correct.

2              MR. BELLMORE:  That's all the questions I have, Your

3    Honor.

4              THE COURT:  All right.  Thank you.

5              THE WITNESS:  Am I allowed to --

6              THE COURT:  Well, why don't we hear from the

7    witnesses that are going to address the sentencing guidelines

8    here.

9              MR. GREENLEY:  You may step down, Canya.

10             THE COURT:  Okay.

11             MR. GREENLEY:  Your Honor, I'd call Brenda Townsend.

12                      BRENDA TOWNSEND,

13   called as a witness, being first duly sworn, was

14   examined and testified as follows:

15                      DIRECT EXAMINATION

16   BY MR. GREENLEY:

17   Q.        Would you please state your name?

18   A.        Brenda Townsend.

19   Q.        How do you spell your last name?

20   A.        T-O-W-N-S-E-N-D.

21   Q.        And where do you live, Ms. Townsend?

22   A.        Post Falls, Idaho.

23   Q.        How old are you?

24   A.        34.

25   Q.        For this part of the hearing I just want to talk

1  about some incidents that happened with Mr. Fly back around

2  1996, I believe.

3  A.        Yes.

4  Q.        How did you first -- what is your relationship to

5  Tiffany Fly?

6  A.        I'm her sister.

7  Q.        Younger sister?

8  A.        Yes.

9  Q.        And how did you first meet the defendant?

10  A.        My sister used to babysit me and then she went over

11  to his apartment and that's how I met him.

12  Q.        What was her relationship to the defendant at that

13  time?

14  A.        How was Tiffany and Tony's relationship?

15  Q.        Yeah.

16  A.        From a ten-year-old's point of view, I guess okay.

17  Q.        She was dating Mr. Fly?

18  A.        Yes.  Dating, yes.

19  Q.        So you were ten, she was how old?

20  A.        She's five and a half years older than me, all

21  depends on what month.  Five years.

22  Q.        So about 16 years old?

23  A.        Yes.  Sorry.

24  Q.        How old was Mr. Fly?

25  A.        Nine years older than Tiffany, so 25, I think.

1   Q.        Where did your sister live at that time?

2   A.        In Manteca.

3   Q.        Where is that?

4   A.        California.

5   Q.        And that's where you lived too?

6   A.        Yes.

7   Q.        Now, did you live with your sister?

8   A.        And my mom and my dad.

9   Q.        You lived with your parents?

10  A.        Yes.

11  Q.        Did she live with your parents?

12  A.        Yes.

13  Q.        Where did Mr. Fly live?

14  A.        In some apartment -- I don't know -- close by.  Not

15  very far.  Manteca.

16  Q.        And sometimes you said Tiffany would babysit you?

17  A.        Yes.

18  Q.        Where would that happen?

19  A.        Where did it happen?  Manteca, California.  Every

20  day.

21  Q.        At your parents' house or at Mr. Fly's house?

22  A.        At my parents' house but she would drive over to his

23  apartment afterwards, like after school.

24  Q.        Okay.  And that's how you met him the first time?

25  A.        Yes.

1  Q.      How well did you get to know Mr. Fly?

2  A.      Very well.

3  Q.      And do you have an idea of how long -- I guess, how

4  long did you live in California when Mr. Fly was there?

5  A.      It was '97 last time I seen him.

6  Q.      Okay.  Had he been married prior to this?

7  A.      Was I married?

8  Q.      No, the defendant.

9  A.      I don't know.

10  Q.      Okay.  Did anything happen between you and the

11  defendant at the time that your sister was dating him in

12  Manteca?

13  A.      Yes.

14  Q.      What happened?

15  A.      The very first time he tickled me and his hand went

16  straight to my private area.

17  Q.      Was there anybody else in the room?

18  A.      Yes.

19  Q.      Who was there?

20  A.      My sister.

21  Q.      And did she know it happened?

22  A.      No.

23  Q.      And did things progress from there?

24  A.      Yes.

25  Q.      What other kinds of things did Mr. Fly do?

1  A.        Sex, him putting his mouth on my private area, and a

2  lot of car rides, and a lot of going to work with him in the

3  middle of the night.

4  Q.        A lot of going to work with him in the middle of the

5  night?

6  A.        Yes.

7  Q.        And what happened at work?

8  A.        In the bathroom at the radio station he would have

9  sex with me.

10  Q.        And when you say sex, you mean vaginal sex?

11  A.        Yes.

12  Q.        And you were ten years old when this was happening?

13  A.        When it started, yes.

14  Q.        Did you tell anybody about it when you were ten?

15  A.        About the hand in my crotch, I told my sister first.

16  Q.        Okay.  And there was eventually an investigation;

17  correct?

18  A.        Yes.

19  Q.        That was -- was that done by the Stockton Police

20  Department?

21  A.        Yes.

22  Q.        And that's in California?

23  A.        Yes.

24  Q.        Did Mr. Fly do anything to try to convince you not to

25  tell anyone?

1   A.        Yes.

2   Q.        What did he do?

3   A.        "I'm a liar," he was -- his biggest comments.  My mom

4   and dad was going through a divorce at the time so I would

5   visit my mom, visit my dad.  And he would go over to my dad's

6   house with my sister, and so when I was there, he would, like,

7   "You're lying.  No one's going to believe you."

8   Q.        So when you said, on the record, to be clear, "I'm a

9   liar," that's what the defendant was telling you at the time?

10  A.        Yes.

11  Q.        Did he say anything else to you?

12  A.        Yes.  A lot of threats at the time.

13  Q.        What kinds of threats?

14  A.        That I'm not going to ever see my sister again and --

15  you know, and basically my mom.  But then that was -- he hated

16  my mom so that made sense to me at the time, I knew he would

17  really do it because he hated my mom.

18  Q.        And he was making those threats for what reason?

19  A.        For I wouldn't say anything to anybody else, say

20  anything to open up.  I don't know.

21  Q.        Did he ever say anything to you to get you to do

22  things with him?

23  A.        What?

24  Q.        Did he ever try to persuade you to do things?

25  A.        Yes.

1  Q.        And did he say anything to, I guess, sweet talk you?

2  A.        Yes.  I was ten and I loved baby dolls, loved them.

3  But, you know, when you have an older man and when he's doing

4  those kinds of things to you, you start to think that it's, oh,

5  wow, you know, he wants to marry me.  He wants to give me a

6  baby.

7  Q.        Those are things he was saying?

8  A.        Yes.  Run to Mexico, marry me so I can have babies,

9  at ten.

10 Q.        And then do you know if that case was set for trial?

11 A.        It was set for trial.

12 Q.        And then sometime after it was set for trial the case

13 was dismissed; right?

14 A.        Yes, and I don't know why.

15 Q.        And you were still only 10 or 11 years old when the

16 case was dismissed?

17 A.        Twelve, I believe.

18 Q.        Twelve?

19 A.        I believe.

20 Q.        Thank you, Ms. Townsend.  I understand that you also

21 have a victim statement that you'd like to read at some point.

22 A.        I do want to read it to the Judge.  Yes, I do.

23         THE COURT:  Mr. Bellmore, is there a specific

24 sentencing guideline that's at issue here that I should know

25 about?

1          MR. BELLMORE:  No.  I would argue this is irrelevant

2  conduct but for whatever this is worth.

3          THE COURT:  Do you have any questions?

4          MR. BELLMORE:  Your Honor, just a couple.

5                  CROSS-EXAMINATION

6  BY MR. BELLMORE:

7  Q.      Ms. Townsend, this took place in California?

8  A.      Yes.

9  Q.      About 1996?

10  A.      I was ten.  I was born in '83.

11  Q.      Okay.  And this took place in the State of California

12  but Stockton, California?

13  A.      It happened in Manteca, California.

14  Q.      Okay.  And only happened in California?

15  A.      Yes.

16  Q.      Nothing ever happened in North Dakota?

17  A.      No.

18  Q.      Okay.

19  A.      Happened in Arizona.

20  Q.      All right.  And you told law enforcement that you

21  were pregnant as a result of this, is that my understanding of

22  what took place?

23  A.      I guess I did.

24  Q.      But it turns out you were not?

25  A.      Thank goodness.

1    Q.        Did you have any communication with this family other

2    than with Tony and Tiffany and the kids?  Did you maintain a

3    relationship with them?

4    A.        I didn't maintain it.  No, I did not.  I didn't

5    maintain it.  But, yes, I have seen him this whole entire time,

6    other than him being -- all the time he's ever been arrested

7    and in prison.

8    Q.        When's the last time you spoke to him?

9    A.        Last time I spoke to him, I can't remember.  I

10   honestly can't remember.  It was a couple -- I actually -- I

11   don't know.  I don't remember.

12   Q.        Within five years?

13   A.        No, no.  It was actually, I know December, not this

14   last Christmas but the year before, when he showed up at my

15   house with my sister and her family.

16            MR. BELLMORE:  That's all the questions I have.

17            THE COURT:  Thank you.  I will give you an

18   opportunity to read your statement.

19            THE WITNESS:  Thank you.

20            THE COURT:  Any other witnesses to deal with

21   sentencing guidelines?

22            MR. GREENLEY:  I think that does deal with our

23   guidelines here, Your Honor, as far as the threats and the

24   force.  I'm offering her under Rule 413, which states that the

25   prosecution can offer this type of evidence on any matter to

1    which it is relevant.

2              THE COURT:  No, I understand that.  I'm trying to

3    focus on the sentencing guidelines here first and foremost.

4              MR. GREENLEY:  Well, the other thing I'd like to

5    offer, Your Honor, is the DNA analysis report.  And I guess my

6    intention was to call Special Agent Chandler to establish some

7    foundation talk for that.

8              THE COURT:  All right.

9              MR. GREENLEY:  I'd call her now.

10                   AMY CHANDLER,

11   called as a witness, being first duly sworn, was

12   examined and testified as follows:

13                 DIRECT EXAMINATION

14   BY MR. GREENLEY:

15   Q.        Would you please state your name?

16   A.        Amy Chandler.

17   Q.        You're a special agent with the FBI?

18   A.        Yes.

19   Q.        You're assigned to the Minot office?

20   A.        Yes.

21   Q.        And you work a number of different types of cases

22   including violent crimes?

23   A.        I do.

24   Q.        How long have you been an FBI agent?

25   A.        Since April 2010.

1    Q.        Regarding this case involving William Fly, when did

2    you first meet Canya?

3    A.        In July, 2016.

4    Q.        And was that right after she discovered that she was

5    pregnant?

6    A.        A few days after, yes.

7    Q.        And this was -- you were assigned to the

8    investigation; correct?

9    A.        Yes.

10   Q.        I guess to just summarize, my understanding is at the

11   time most of the, if not all of the incidents that you believe

12   occurred, took place outside of the State of North Dakota?

13   A.        Yes.

14   Q.        And that's how the FBI got involved in this case?

15   A.        Yes.

16   Q.        Shortly after you spoke with Canya for the first

17   time, did you execute a search warrant and arrest Mr. Fly?

18   A.        Yes.  I didn't personally arrest him, but yes.

19   Q.        Where was he arrested?

20   A.        In Idaho.

21   Q.        That was also by the FBI?

22   A.        Yes, it was.

23   Q.        And what date was it that you met Canya?

24   A.        I believe it would have been a Tuesday or Wednesday.

25   Q.        And then that following Friday Mr. Fly was arrested?

1  A.       Yes.

2  Q.       And was that Friday July 15, 2016?

3  A.       Yes.

4  Q.       And did you speak to Tiffany Fly on that same day?

5  A.       Yes.

6  Q.       Did she tell you what her plans were as far as Idaho?

7  A.       That they were all about to leave, that's why we

8  executed the warrants when we did.

9  Q.       Now, it is true that you met with Canya Fly a number

10 of times; correct?

11 A.       Yes.

12 Q.       And, in fact, in your caseload you meet with numerous

13 victims; correct?

14 A.       Yes.

15 Q.       And you're good at keeping in contact with victims?

16 A.       Try to be.

17 Q.       Do you go over the facts of the case every time you

18 meet with a victim?

19 A.       No.

20 Q.       In fact, is that something that you endeavor to do?

21 A.       To go over it?  I try to go over the details as few

22 times as possible.

23 Q.       So you try to get everything initially, right away?

24 A.       Yes.

25 Q.       And then not bring it up again?

1   A.        Correct.

2   Q.        Did you ask Canya, at any of those follow-up

3   meetings, whether Tony Fly used force?

4   A.        I don't believe I did.

5   Q.        It isn't something that she mentioned initially;

6   correct?

7   A.        No, not in that sense.

8   Q.        But she never told you that she consented or wanted

9   to have sexual relations with her father?

10  A.        Absolutely not.

11  Q.        Did you apply or at least draft an affidavit for a

12  search warrant to get Mr. Fly's DNA?

13  A.        Yes, I did.

14  Q.        And was that search warrant granted?

15  A.        Yes, it was.

16  Q.        Did you execute it personally?

17  A.        I did.

18  Q.        Were you able to collect a buccal swab from Mr. Fly?

19  A.        I did.

20  Q.        And did you collect a swab from Canya Fry and her

21  child?

22  A.        I did.

23  Q.        And what did you do with those samples?

24  A.        I submitted three samples to the North Dakota Crime

25  Lab.

1    Q.        And is the North Dakota Crime Lab -- let me back up.

2    What was the purpose of submitting them to the crime lab?

3    A.        To determine paternity of the baby.

4    Q.        Who did you speak to at North Dakota Crime Lab?

5    A.        Stephanie Maier.

6    Q.        And did she tell you whether or not North Dakota

7    Crime Lab could determine paternity in this particular case?

8    A.        I believe it's a software issue.  That somehow that

9    they can't do the percentage to exclude him as the father.

10   Q.        And that was because the defendant is related to

11   Canya Fly?

12   A.        Correct.

13   Q.        So what did Stephanie Maier, at the North Dakota BCI,

14   suggest you do?

15   A.        To send it to a private lab.

16   Q.        What was that private lab?

17   A.        Bode Cellmark.

18   Q.        And were you able to secure funding from the FBI so

19   that Bode Cellmark could do the lab analysis?

20   A.        I did.

21   Q.        And did you, in fact, request the North Dakota BCI to

22   send the DNA profiles to Bode Cellmark to do the DNA analysis?

23   A.        Yes.

24   Q.        And did you ultimately get a report from Bode

25   Cellmark?

1   A.        I did.

2   Q.        Do you recall the forensic scientist who you received

3   the report from?

4   A.        I believe it's Kristina Nash.

5   Q.        Okay.  I'm showing you Government's Exhibit No. 1.

6             MR. GREENLEY:  May I approach, Your Honor?

7             THE COURT:  You may.

8   Q.        Special Agent Chandler, I'm handing you Government

9   Exhibit No. 1.  Is Exhibit No. 1 the report that Kristina Nash

10  sent to you?

11  A.        Yes.

12  Q.        And that is the results of the DNA analysis that you

13  requested?

14  A.        Yes.

15            MR. GREENLEY:  And, Your Honor, I'd offer Exhibit

16  No. 1.

17            MR. BELLMORE:  Your Honor, I would object under the

18  Sixth Amendment confrontation clause to the rules.

19            THE COURT:  Rules of evidence don't apply to

20  sentencing hearings usually.

21            MR. BELLMORE:  It's not an evidentiary objection,

22  Your Honor.  It's a constitutional issue of fundamental

23  fairness.

24            THE COURT:  Objection is overruled.

25            (Government Exhibit No. 1 received.)

1  BY MR. GREENLEY:

2  Q.        Can you summarize, Special Agent Chandler, for the

3  Court what the results of the paternity test was?

4  A.        In layman's terms?

5  Q.        Yes.

6  A.        He's the father.

7  Q.        Okay.  But what it actually gives is a statistical

8  probability that Mr. Fly is the father of his grandchild versus

9  a random individual?

10  A.        Yes.

11  Q.        And he's -- is it true that he's 127 million times

12  more likely to be the father than an unrelated Caucasian

13  individual?

14  A.        Correct.

15            MR. GREENLEY:  Your Honor, I have no further

16  questions for Special Agent Chandler.

17            THE COURT:  Any questions, Mr. Bellmore?

18                    CROSS-EXAMINATION

19  BY MR. BELLMORE:

20  Q.        Special Agent Chandler, my understanding is you met

21  with Canya for the first time on July 13, 2016.  Does that

22  sound like a --

23  A.        Sounds about right.

24  Q.        Okay.  And you didn't -- at that time, that was the

25  first time you had met her?

```
 1   A.         Yes.

 2   Q.         You had been briefed, generally, about what the --

 3   what was alleged to have happened?

 4   A.         Yes.

 5   Q.         And you had the opportunity to speak with Canya

 6   one-on-one?

 7   A.         Yes.

 8   Q.         Although she had been -- this was in Devils Lake?

 9   A.         Yes, it was.

10   Q.         Her mother had brought her there?

11   A.         Yes.

12   Q.         And her mother is Tiffany Fly?

13   A.         Yes.

14   Q.         You had spoken to Tiffany Fly prior to meeting with

15   Canya?

16   A.         Briefly.

17   Q.         Okay.  But when you spoke with Canya, Tiffany wasn't

18   there?

19   A.         Correct.

20   Q.         No other law enforcement officers were there, it was

21   just you and Canya?

22   A.         Yes, when we did the interview.

23   Q.         Did you ask her what happened?

24   A.         Yes.

25   Q.         Did she mention anything about force?
```

1  A.        I don't recall her at that time -- she was reluctant

2  to speak at that time.

3          MR. BELLMORE:  That's all the questions I have, Your

4  Honor.

5          THE COURT:  All right.  Thank you.  You may step

6  down.

7          Any other testimony being presented on the applicable

8  sentencing guideline?

9          MR. GREENLEY:  Not on the guidelines, Your Honor.

10  Thank you.

11          THE COURT:  Mr. Bellmore, do you have any evidence

12  that you intend to present as to the relevant applicable

13  advisory sentencing guidelines?

14          MR. BELLMORE:  No, I don't, Your Honor.

15          THE COURT:  All right.  So before we hear from any

16  other witnesses and statements that they may have prepared, I

17  want to talk about the sentencing guidelines and give both

18  counsel an opportunity to tell me what they believe are the

19  appropriate sentencing guidelines that have been implicated in

20  this case, Mr. Bellmore.  And I have read the briefs several

21  times, so I know generally what the arguments are.  But I'll

22  listen to any other arguments people want to raise.

23          MR. BELLMORE:  Would you like me to go first, Your

24  Honor?  I'm sorry.  I didn't hear.

25          THE COURT:  You're the one that had the objections to

1    the guidelines.

2              MR. BELLMORE:  Yes, Your Honor.

3              Basically what our argument is, for the guidelines,

4    are that under the -- excuse me.

5              THE COURT:  2G1.1.

6              MR. BELLMORE:  2G1.1, Your Honor, we are objecting to

7    the cross-reference under Subsection C of that section.  We

8    believe that Section A2 is the appropriate base offense level,

9    which is 14.  That's the standard base offense level for a

10   violation under 18 United States Code Section 2421(a) of the

11   offense of transportation to engage with intent to engage in

12   elicit sex.  Basically here the information does not mention

13   sexual abuse, aggravated sexual abuse.  It specifically is

14   limited to incest, that is what Mr. Fly has agreed happened.

15             The first enhancement, I think, the one that changes

16   the complexion of all these guidelines, is that cross-reference

17   to sexual abuse, which is 30.  We don't believe that this was a

18   sexual abuse situation.  I don't think any of the evidence

19   presented through testimony today indicates that this was

20   sexual abuse for the reasons set forth in my supplemental

21   sentencing memorandum, Your Honor.

22             Specifically getting to the issue of force, I refer

23   the Court to *United States versus Fire Thunder*, that's under

24   908 F.2d 274 [sic].  It's an Eighth Circuit case from 1990 that

25   detailed what is required force, commonly cited case when that

1    issue comes up in cases involving aggravated sexual abuse.

2    That particular case found that force is met when sexual

3    contact is resulted from a restraint upon the other person that

4    was sufficient, that the other person could not escape the

5    sexual contact.  I don't believe anything that's been offered

6    here today indicates that that was the case.

7         The 2241 enhancement is brought under 2A3.1(b)(1),

8    that's a 4-level adjustment for use of force because we believe

9    that there was not sufficient evidence shown on that, then that

10   enhancement is not proper.

11        The next one, Your Honor, is 2-level enhancement for

12   care, custody, and supervisory control.  I did not -- we did

13   not object to anything in the PSR that indicated Canya Fly was

14   an adult at the time of this offense.  She was not a minor.

15   She was at least 18 years old during the course of these trips.

16        The guidelines generally discuss what happens when

17   somebody's a minor, and a lot of the examples or case law

18   regarding this has to do with a minor child and whether or not,

19   you know, if a distant family member or a neighbor or an

20   acquaintance of the parents has established a supervisory

21   custodial role here.  That's just not appropriate.  That she

22   was 18 years old, there was no indication that she was forced

23   to go on these trips.

24        It is our position that of all the people in the

25   family Canya was best suited to travel.  For one, Tiffany Fly

1    was the mother of the younger daughter, who was 12, I believe,

2    at the time.  The older son wasn't able to -- was unable to

3    drive due to some, excuse me, physical or mental conditions

4    that he had.  The other son was, at that time, undergoing

5    schooling.  It was the decision of the family that Canya go.

6    She was not held or forced against her will to travel on these

7    trips.

8            THE COURT:  So can an adult male be in supervisory

9    control of an adult female victim?  The guidelines said nothing

10   about that.

11           MR. BELLMORE:  Right.  I'm sure it's possible.  But

12   even if that were the case, I don't think that's present here.

13   She was independent, was trusted by her parents, if you

14   discount the defendant, at least Tiffany Fly, the mother, to

15   take care of the younger sister in Idaho for several weeks.

16           THE COURT:  So for what purpose was Canya required to

17   go on these trips with her father?

18           MR. BELLMORE:  To be the other driver, to drive from

19   point A to point B when these cars get dropped off.  She could

20   follow the car as it's being transported, but in between

21   pickups another car was necessary to transport the defendant

22   here as well as to return him back.

23           THE COURT:  I've been involved with other defendants

24   that were involved in transporting cars for different car fleet

25   services, and generally they travel by themselves; they pick up

1    a car, drop it off at one spot, pick up another car there, drop

2    it off at another spot, and at the end of the day to get back

3    home they fly, rent a car, or take a bus.

4            MR. BELLMORE:  My understanding is the evidence would

5    have shown, at trial, that these locations -- it wasn't drop it

6    off from point A to point B and point B there was going to be a

7    car waiting, it was across town.  For example, there was trip

8    in Colorado or Wyoming that they had to go across Denver.  And

9    so --

10           THE COURT:  So you take an Uber ride for six and a

11   half bucks to get from one point to the other in Denver.

12           MR. BELLMORE:  There's also long trips home, and they

13   would share driving duties going back and forth, Your Honor.  I

14   think that also would have been the testimony at trial.

15           THE COURT:  All right.  But you agree it's possible

16   that an adult male could be in supervisory control of an adult

17   child?

18           MR. BELLMORE:  Sure.  If that adult child, for

19   example, had special needs, or something like that.  But I

20   believe Canya was perfectly capable -- she had a driver's

21   license, drove without any incidents, no traffic incidents or

22   anything -- along these trips.  She had a pretty solid work

23   history.  She started working pretty young, 14 years old, and

24   was able to get and maintain jobs.  So I think she was a fully

25   capable person and was not a dependent or in the custody or

1   direct control of either parent in this case.  So that

2   enhancement, I don't believe, is appropriate.

3          The last one, Your Honor, is the 2-level enhancement

4   for obstruction of justice.  I know this relates to text

5   messages or should be stated that these were Facebook messages.

6   And, again, this is the situation where it's a message that

7   says, "Tell a lie."  I think the information that was getting

8   back to the defendant was that this was a forcible, sexual

9   assault.  And that's something that, as I noted in my

10  sentencing memo, that Fly has denied.  That he is accepting

11  responsibility for what he believes is his limited role in

12  these offenses and as it was being described and as he's being

13  accused of, he disagreed with that.

14         THE COURT:  Well, he's admitted that he's had sexual

15  relations with his daughter, i.e., incest.  Right?

16         MR. BELLMORE:  Yes.  That was --

17         THE COURT:  So it's his position that was an entirely

18  consensual relationship of some sort?

19         MR. BELLMORE:  No.  But he had a very specific

20  response in his Facebook messages.  And he's just saying, "Tell

21  them you lied."  Not lie, and tell them you made it all up.

22  Even if that were the case, if she had made up a portion of it,

23  that's not obstruction.  That was not, first of all --

24         THE COURT:  So what was he telling her to say to the

25  FBI?  That it was a consensual relationship?

1          MR. BELLMORE:  No, just to tell the truth of what

2   happened.  There's this force allegation.

3          THE COURT:  And what was the truth of what happened?

4          MR. BELLMORE:  That it was an incestuous

5   relationship.

6          THE COURT:  Okay.  All right.

7          MR. BELLMORE:  I don't think there's going to be a

8   Facebook message that says this is entirely false.  And that's

9   my --

10          THE COURT:  No, but there's her direct testimony that

11   she said he told her to lie to the FBI, to tell them that it

12   was all false.

13          MR. BELLMORE:  No.  That's not my understanding of --

14          THE COURT:  Well, that's what I heard from the

15   witness stand today, but anyway.

16          MR. BELLMORE:  But as far as that goes in the PSR, I

17   would not object to any of the factual information in there

18   that -- my objection to that in the PSR, as well as the

19   inclusion of this in the sentencing guidelines is he wasn't

20   telling her to lie, he was telling her to tell the truth.

21   That's our position on it.

22          THE COURT:  So he would want her to tell the FBI that

23   her father had had sex with her on the road?

24          MR. BELLMORE:  Well, he wouldn't want that, but he's

25   telling her that -- there's a difference between an incestuous

1    relationship and one that is done entirely by violence, which

2    he is disputing in this case.  And so that -- he'd deny the

3    intent to obstruct.  This was limited to Facebook messages.

4    There was nothing that was done, nothing that was threatened,

5    so we don't believe that that 2-level enhancement applies.

6          So, again, we're asking that the Court impose the

7    base offense level under 2G1.3, Your Honor.  There are no

8    applicable adjustments, that a criminal history in this case is

9    not in dispute, that he has a Criminal History Category II as

10   detailed in the presentence report.  And as a result, the

11   guidelines are 12 to 18 months.

12         THE COURT:  Well, let's get back to the cross-

13   reference under Section 2G1.1, specifically 2G1.1, Subsection

14   C.  You talked about the fact that you believe there wasn't any

15   evidence of force against the victim, which is one possible

16   component that would trigger the cross-reference.  You didn't

17   say anything about whether the defendant threatened or placed

18   the victim in fear that any person would be subject to death,

19   serious bodily injury, which is another component under Section

20   2241, Subpart B, that would trigger the cross-reference that

21   would in turn trigger a higher base offense level of 14.

22         So are you saying that there was no evidence of any

23   threat or placing the victim in fear in this case that would --

24         MR. BELLMORE:  Your Honor, my concern with those --

25   any testimony today that touched on that was they were so

1    disjointed as far as when it occurred in relation to these

2    offenses.

3            THE COURT:  Well, she testified that it occurred

4    between the time frame of February, 2016, and May of 2016, and

5    it also occurred on numerous other occasions in years prior to

6    that.  So would you agree, if I believe her testimony, that

7    that would indeed trigger the cross-reference under 2G1.1,

8    Subpart C.

9            MR. BELLMORE:  And that would be the cross-reference

10   to sexual abuse as opposed to the start with the sexual abuse

11   cross-reference?

12           THE COURT:  Well, it's a cross-reference to either

13   aggravated sex abuse USC 2241, Subpart B, or sexual abuse under

14   18 USC Section 22.42.

15           MR. BELLMORE:  Yes, Your Honor.  First of all, those

16   are different.  It starts with the 30 base offense, which I

17   believe the Court is describing, and I'm not going to disagree

18   that threats of harm to get one to engage in sex, that's the

19   definition of sexual abuse and so that's what the Court is

20   dealing with here.

21           THE COURT:  Right.

22           MR. BELLMORE:  It's Fly's position that those

23   weren't -- that the victim here cannot be believed, that the

24   testimony was not credible, that he never made threats to her.

25   The threat that was detailed on cross-examination was one that

1    she consistently made to the FBI and other agents that she --

2              THE COURT:  But do you agree that if I find the

3    victim's, Canya Fly's, testimony to be credible and believable,

4    that her testimony alone would trigger the threatening or

5    placing the victim in fear component of aggravated sex abuse?

6              MR. BELLMORE:  Yes, Your Honor.  Threats of harm to

7    her directly or to others would qualify to that.  We're just

8    asking the Court find the testimony in this specific regard is

9    not credible.

10             THE COURT:  Okay.  Mr. Greenley.

11             MR. GREENLEY:  Well, Your Honor, I'm in agreement

12   with the PSI as written.  I think the Court has already touched

13   on how we get to the cross-reference and there's three ways:

14   There's force, threats of death, or we could use the sex abuse

15   cross-reference, which is placing Canya in fear.  Her testimony

16   touches on all three.  That she stated on the stand, with

17   respect to trips that occurred during the AmeriFleet time

18   period, that Mr. Fly threatened not only her life but her

19   mother's life, to make her -- she said to make her submit and

20   to keep her quiet.  And, in fact, despite all this abuse, she

21   never did report, until the baby was born in this case.  We'd

22   ask for the 34 level cross-reference, but if --

23             THE COURT:  Well, it's 30, isn't it?

24             MR. GREENLEY:  Well, yeah.  Plus -- we ask for the

25   plus four then for the force or threats.

1          THE COURT:  All right.

2          MR. GREENLEY:  With respect to the obstruction, I

3    think there's a number of different types of evidence, one is

4    that Mr. Fly fled to Idaho and he tried to get his family to

5    move to Idaho with him, at the time of his arrest, to avoid

6    accountability in this matter.  Canya testified that she was

7    messaged dozens of times a day to lie in this case.  And

8    frankly, Mr. Fly's statement that, or through his attorney,

9    that he was trying to tell her to be honest about the incest is

10   unrealistic.  At the same time that he's sending all of these

11   messages to Canya, he's telling her that he would never use

12   force.  So in some respects he's admitting to the incest

13   conduct, and he's just trying to deny the force at the time.

14   And while he's half admitting to the crime, he's telling her to

15   change her story to the FBI.  And because it is so

16   overwhelming, dozens of times a day, we would ask for the

17   obstruction enhancement.

18          As far as the care, custody, and control, again, I

19   think the Court understands the entire issue.  Certainly an

20   adult could be in the care, custody or control of another

21   person -- somebody who is in adult day care, somebody's who's

22   in a nursing home, somebody who has a guardian for various

23   reasons.  The testimony here, I think the particularly salient

24   point is that Canya said she was not an employee when she went

25   on these trips.  She was going on these trips because her

1    father needed her to do the driving.  He was basically telling

2    her what to do, she was not getting paid for it.  And that's

3    the kind of relationship that indicates she was in his custody

4    at the time she did that.  And based upon the types of jobs she

5    was testifying about, the fact that she was living at home and

6    that he decided whether or not she could go out, I think

7    clearly Canya Fly was in the custody of Tony Fly at the time of

8    this offense.

9              I think that covers the guidelines that are

10   contested, at least broadly, Your Honor.

11             MR. BELLMORE:  Your Honor, may I address one?

12             THE COURT:  Sure.  I was going to give you an

13   opportunity to have the last argument.

14             MR. BELLMORE:  As the Government referred to threats

15   to family members, specifically the mother, the testimony this

16   afternoon was that that threat was made during an incident that

17   occurred in Minot three years before this investigation came to

18   light.  So that's completely unrelated, I don't think that

19   should be taken into consideration.

20             THE COURT:  Well, the testimony of Canya Fly earlier

21   in her presentation was she started talking about the sex abuse

22   starting at age nine, and then in response to questions from

23   Mr. Greenley she stated that Mr. Fly told her he would kill her

24   family if she told anyone, or words to that affect, and those

25   threats pervaded throughout all of the sexual abuse.  I mean,

1    it was more than one occasion that she eluded to where that

2    threat was made.

3              Anything else on the guidelines?

4              MR. BELLMORE:  No, Your Honor.

5              THE COURT:  All right.  Well, we're going to take a

6    short break but I want to rule on the guideline issues first.

7    I want to give my court reporter a break.  We won't take any

8    longer than probably ten minutes, but I want to rule on the

9    sentencing guidelines before we take a break.  And then we'll

10   come back, hear from any witnesses that have other victim

11   impact statements to give and I'll listen to the

12   recommendations of both attorneys, and give Mr. Fly an

13   opportunity to speak as well.

14             But as to the sentencing guidelines, when there's

15   disputed advisory sentencing guidelines at issue, in any case,

16   the Court is required to make factual findings.  I'm required

17   to make my findings by a preponderance of the evidence, and all

18   of my findings will be made based upon that standard.

19             The presentence report, at paragraph 16, determined

20   that the conduct in the instant offense here constituted

21   aggravated sexual abuse, as that crime is defined under 18 USC

22   Section 2241, Subpart A.  And because of that the base offense

23   level increased from 14 up to 30.  That's in accordance with

24   Section 2A3.1, Subpart A, Subpart 2.  All set forth, again, in

25   paragraph 16 of the presentence report.

1           The issue becomes whether the defendant used force

2   against the victim, Canya Fly, or did he threaten her or place

3   her in fear that any person would be subject to death, serious

4   bodily injury.  And if that occurred, then that triggers this

5   adjustment to offense level 30 under the crime of aggravated

6   sex abuse.

7           It's my finding, by a preponderance of the evidence,

8   that the defendant did indeed cause the victim, Canya Fly, to

9   engage in a sexual act by threatening her or by placing her in

10  fear of death or serious bodily injury to herself, or to her

11  mother or to other family members.  I base that largely on the

12  testimony of Ms. Fly, and her testimony I find to be credible

13  and believable, and there isn't any real evidence to refute her

14  testimony.  So it's my finding that the presentence reporter is

15  accurate in terms of finding a base offense level of 30 in this

16  case.

17          I believe Ms. Fly's testimony when she said that the

18  sexual assaults not only occurred in April and May of 2016, but

19  for years prior to that.  I completely believe her testimony

20  that her father made threats directed at her and to family

21  members, if she ever told anyone, that's fairly commonplace

22  among pedophiles; and that the threats were made not only to

23  entice her to engage in sexual acts, but also to threaten her

24  if she told anyone about it; and that those threats occurred

25  during the time frame of the offense level, namely in 2016.

1    And there were also threats of force because I believe

2    Ms. Fly's testimony that her father, on occasion, would use

3    cords, and belts, his hands, or threatening words to compel her

4    to engage in sexual acts.  Testimony is believable, credible,

5    under the circumstances.

6            So then we talk about the other enhancements that

7    were identified in the presentence report.  First of all,

8    paragraph 17, there's a five point or 5-level enhancement if

9    the conduct involved, that described in 18 USC 2241(a), the

10   offense did involve, did indeed involve coercion that triggers

11   the 4-level enhancement.  I believe the presentence report is

12   accurate and accurately reflects the conduct of the defendant

13   in this case.  If there wasn't a coercion involved in this

14   case, I don't know whatever occurred.

15           The only defense, Mr. Fly, that you have is that this

16   was somehow a consensual act, no coercion on your part.  But

17   what father engages in a consensual sexual act with his

18   daughter.  This is a young lady, 18 years old, been subjected

19   to sexual abuse from the time she was nine.  I can't believe

20   what kind of trauma that would impose upon any young lady and

21   particularly feel that she was coerced.  It's not a consensual

22   relationship.  It doesn't exist under this scenario.

23           Paragraph 18 reveals the presentence reporter found a

24   two-point enhancement because the defendant was in the custody,

25   care, or supervisory control of the victim.  It's my finding

1    by preponderance of the evidence that Canya Fly was indeed in

2    the defendant's custody, care, and particularly his supervisory

3    control.  She may have arguably been an independent

4    18-year-old, but she wasn't working at the time.  She wasn't

5    going to school.  She wasn't earning any income.  She was

6    traveling at her father's request so that he could engage in

7    sexual relations with her.  He was in his supervisory control

8    of her while he was on the road traveling and not paying her

9    for her services.

10         The last enhancement is found in paragraph 21 of the

11   presentence report, it's entitled "Adjustment for Obstruction

12   of Justice."  The drafter of the presentence report found that

13   there would be -- should be a two point or a 2-level upward

14   enhancement under Section 3C1.1 because the defendant attempted

15   to obstruct justice by attempting to manipulate the victim in a

16   chain of reporting to authorities.

17         Ms. Fly testified that the defendant, William Fly,

18   wanted her to lie to the FBI and told her to do so, to tell

19   them that all of her testimony is false.  And he conveyed that

20   message to her at least 12 times a day.  That's fairly clear

21   evidence of obstruction of justice and efforts to try to

22   manipulate the victim.  I'm not sure what the defense of

23   Mr. Fly is from those messages, and what exactly he wanted her

24   to say to the FBI:  Tell the truth that she was raped by her

25   father while on road trips?  The argument doesn't make any

1    sense to me.

2            It's my finding, by a preponderance of the evidence,

3    that the determination of a base offense level in paragraph 16

4    and the upward adjustments identified in paragraph 17, 18, and

5    22, all apply in this case.  I will not address acceptance of

6    responsibility in paragraphs 24 and 25 because, one, it doesn't

7    make any difference in terms of the sentences that will be

8    imposed in this case.  But I would note, for the record, that

9    I'm not convinced that the defendant has clearly demonstrated

10   acceptance of responsibility for this offense.  But I need not

11   address that issue because it's not going to affect the

12   sentence to be imposed.

13           As a result, presentence report established a total

14   adjusted offense level of 35, a Criminal History Category of

15   II, the advisory guideline range is 188 to 235 months,

16   unfortunately there's a statutory maximum in this case of

17   120 months.  Those are my findings, all by a preponderance of

18   the evidence.

19           Any questions, need for clarification that either

20   counsel wishes to request of me before we take a break?

21           MR. GREENLEY:  No, Your Honor.  Thank you.

22           MR. BELLMORE:  Your Honor, I would object to the

23   Court's findings on the sentencing guidelines inconsistent with

24   the argument set forth in my sentencing memorandum.  At this

25   time I don't believe I need any additional clarification or

1    anything else on the record.

2            THE COURT:  All right.  So let's take just a

3    ten-minute break.  We'll come back around twenty after three.

4            How many witnesses to you intend to call,

5    Mr. Greenley, that have statements prepared that they wish to

6    read?

7            MR. GREENLEY:  There's four, Your Honor.

8            THE COURT:  Four?  And these are all written

9    statements that they prepared that they intend to read?

10           MR. GREENLEY:  For the most part.  I don't believe

11   Canya's sister prepared a written statement, but she would like

12   to address the Court as well.

13           THE COURT:  All right.  And do you have any

14   witnesses, Mr. Bellmore?

15           MR. BELLMORE:  No, Your Honor.

16           THE COURT:  All right.  So we'll reconvene in about

17   ten minutes.

18       (Recess taken from 3:11 p.m. to 3:22 p.m.)

19           THE COURT:  Well, we're back on the record in the

20   case of the United States versus William Fly.

21           Mr. Greenley, do you have any other witnesses that

22   have victim impact statements that they wish to read or

23   testimony they wish to present, call them.

24           MR. GREENLEY:  Yes, Your Honor.  I'd first like to

25   ask Canya Fly to address the Court.  Would you like her to take

1    the witness stand?

2              THE COURT:  Yeah, she should.

3                   CANYA FLY,

4    having been previously sworn, returned to the witness

5    stand and testified as follows:

6              THE COURT:  And, Ms. Fly, I'll just remind you that

7    you're still under oath.  We won't have you sworn in again.

8    Just take the stand when you get comfortable up there.

9              Mr. Greenley, you may proceed.

10             MR. GREENLEY:  My understanding is you prepared a

11   statement that you'd like to read to the Judge or tell the

12   Judge.

13             MS. CANYA FLY:  Yes.

14             MR. GREENLEY:  Will you please go ahead.

15             MS. CANYA FLY:  Your Honor, my name is Canya Fly.  I

16   am 20 years old and I am the victim of this crime.

17             I was sexually assaulted by my father, William

18   Anthony Fly.  This crime started when I was nine years of age

19   and continued on until I was 18 and got pregnant.

20             When I found out that I was pregnant, I felt very

21   scared, alone, and that it was all my fault.  I was very

22   emotional.  My nurse would not let me go home.  She had social

23   services and the law enforcement show up to ask me questions.

24   I was not allowed to contact my family and I had to stay with

25   my friend for three days.

1        Parents shouldn't hurt their own children, they

2   should protect them, feed them, give them hugs and kisses and

3   take care of them.

4        William was manipulative, crazy, forceful, focussed

5   only on himself, things were always about him.  He would lie

6   and be dishonest.  He forced me to watch daddy/daughter porn.

7   He would hit me with cords, belts, hangers, and his hand.  He

8   would tell me that I was going to marry him and have his

9   children.

10        I was never allowed to have a boyfriend and when I

11  did have one, William would scare them away.  I spent most of

12  the time feeling scared and frightened when I was around

13  William.

14        William was not my protector, he was the one I needed

15  protecting from.  He ruined my family.  He has made us go

16  through things that are impossible to describe.  My older

17  brother Xylan has been suicidal and is on medication.  He spent

18  a week in the mental hospital.  My mother, Tiffany, and I have

19  a hard time going outside because we live in a small town where

20  everyone knows everything and where you live.

21        William wrote the *Fargo Forum* Newspaper, which made

22  matters worse for my family and I; people on my friend list on

23  my Facebook account shared the post.  It's like I have to

24  relive through this horrible crime all over again.  I have been

25  depressed taking Sertraline, which is an antidepressant pill to

1    help me get through the day.

2            I rarely leave the house to go anywhere.  I fear that

3    when William is released from prison, he will come look for me.

4    I fear that something bad would happen if he did find me.  I

5    don't want him near me or my son.  He should get what he

6    deserves, to never see me or know my son and to stay away from

7    my family.

8            My FBI agent and victim witness specialist have

9    helped me through these past two years.  I am seeing a

10   therapist every week to talk about my feelings.  I feel that

11   William will not have the amount of time spent in prison that

12   he deserves.

13           Thank you for listening to my story.

14           THE COURT:  Anything else from either party?

15           MR. GREENLEY:  Do you have to pay anything

16   out-of-pocket for that therapist?

17           THE WITNESS:  Co-pays.

18           MR. GREENLEY:  Okay.  Thank you, Ms. Fly.

19           MR. BELLMORE:  I have no questions, Your Honor.

20           THE COURT:  All right.  Thank you.  You may step

21   down.

22           MR. GREENLEY:  Your Honor, I'd next call Tiffany Fly.

23                   TIFFANY FLY,

24   called as a witness, being first duly sworn, was

25   examined and testified as follows:

1          MR. GREENLEY:  Would you please state your name for

2     the record.

3          MS. TIFFANY FLY:  Tiffany Fly.

4          MR. GREENLEY:  And would you go ahead and read your

5     statement to the Judge.

6          MS. TIFFANY FLY:  To the Honorable Judge Daniel

7     Hovland, I want you to know that this isn't the first time I've

8     written a letter to a judge about William Fly.  Previous

9     letters I pleaded for him to be released from prison sooner.

10    This letter will be nothing like those other letters.

11         As a mother, it hurts me every day knowing the father

12    of my children abused my daughter in multiple ways ever since

13    she was a young child.  As a result of the sexual abuse, I'm

14    now a grandmother.  It's my fear not knowing if William abused

15    my other children as well.

16         Since William's arrest in 2016, my children and I see

17    a therapist.  Three of my children have had suicidal thoughts;

18    two of those were hospitalized because they had actual plans to

19    end their life.  They take antidepressants daily.

20         This has been hard for our family to deal with, to be

21    out in the public and to hear about what William did and to be

22    questioned about it from other people.  It's hard for us to

23    leave the house.  It's hard for my youngest daughter to go to

24    school.  It's a daily struggle.

25         My daughter is now a mother, and a great mother.  Her

1   child takes up all her time.  She was robbed of her entire

2   childhood and now, as a young adult, she is responsible for

3   caring for a child she didn't ask for.

4          I regret meeting William.  I was manipulated into

5   believing that when accusations were made by my sister as a

6   child that they were all lies, and my family was only trying to

7   break us up; and if we got married, it would solve the problem.

8          Brenda, I'm sorry.

9          William has sent multiple letters since his arrest

10  and if we are still one big -- since his arrest as if we are

11  still one big happy family; stated how he can't wait to come

12  home.

13         William, you have destroyed our family.  You abused

14  your role as a father and a husband.  You betrayed us all.  It

15  disgusts me to know the things that you have done to my

16  daughter and my sister.

17         You are not a woman.  That is a sick excuse for what

18  you have done.  I want a divorce.

19         I have a couple things, Your Honor, from my other

20  children that couldn't be here today.

21         My second oldest son's reads:  "All I have to really

22  say is I love him and I always will because he did create me

23  and is indeed my father.  But I lost all respect -- all respect

24  for him, due to the betrayal of trust.  And at this point I

25  don't know if I can ever forgive him, which I know I need to,

1   but definitely will never forget.  Also I want to thank him for

2   making my family the strongest it has ever been.  And the added

3   motivation he has given me to be even better and accomplish

4   more than I can comprehend, and I won't stop until I do so.  So

5   thank you for that."

6           My oldest son just says that he loves and misses you,

7   and doesn't even realize what you've done.

8           Your Honor, I understand the statutes of the law.

9   Please impose the maximum sentence and lifetime supervision.  I

10  wish for William to never have the possibility of being

11  released from prison, he deserves that much.

12          Thank you.

13          THE COURT:  Thank you.

14          MR. GREENLEY:  Your Honor, I'd re-call Brenda

15  Townsend.

16          THE COURT:  And, Ms. Townsend, we won't have you

17  sworn in again.  I would just remind you that you're still

18  under oath.

19                  BRENDA TOWNSEND,

20  having been previously sworn, returned to the witness

21  stand and testified as follows:

22          MS. TOWNSEND:  I'm going to take a second after

23  hearing all those.

24          Dear Judge, this is a picture of me when it first

25  happened.  I can't -- okay.  Okay.  I'm sorry.

1          How do you write a letter to complete strangers in

2    hopes what you say -- wait, sorry -- how do you write a letter

3    to complete strangers in hopes that they take what you say to

4    heart:  That I am a person, not just a story on a piece of

5    paper; that you're going to appear right before you sentence

6    the man that turned my whole life upside down.

7          To understand or try to understand I have to bring

8    you back to a year -- I can't.  Can you just read it?  Can you

9    just read it.

10          THE COURT:  Sure.  I can read it.  Thank you.

11          THE COURT:  All right.  Next witness.

12          MR. GREENLEY:  Your Honor, I call Zelda Fly.

13                    **ZELDA FLY,**

14    called as a witness, being first duly sworn, was

15    examined and testified as follows:

16          MR. GREENLEY:  Ms. Fly, would you please state your

17    name and spell your name for the record?

18          MS. ZELDA FLY:  Zelda Fly, Z-E-L-D-A.

19          MR. GREENLEY:  How old are you?

20          MS. ZELDA FLY:  14.

21          MR. GREENLEY:  And are you in school?

22          MS. ZELDA FLY:  Yes.

23          MR. GREENLEY:  What grade are you in?

24          MS. ZELDA FLY:  Eighth.

25          MR. GREENLEY:  And would you like to address the

1  Court today?

2       MS. ZELDA FLY:  Yes.

3       MR. GREENLEY:  Go ahead.

4       MS. ZELDA FLY:  What?

5       MR. GREENLEY:  You can go ahead.

6       MS. ZELDA FLY:  Okay.  Your Honor, this has caused

7  severe depression for me and my family.  And it caused me to be

8  hospitalized for three days because of suicidal thoughts.

9       William, you're not a woman.  And what you've done is

10  very wrong and not okay.

11       Your Honor, I wish for him never to be released.  And

12  if he ever is, lifetime watched.

13       Thank you.

14       THE COURT:  Thank you.

15       MR. GREENLEY:  I have no more witnesses, Your Honor.

16       THE COURT:  All right.  And, Mr. Bellmore, you have

17  no witnesses?

18       MR. BELLMORE:  I don't, Your Honor.  But as far as

19  Ms. Townsend's letter, if that's going to be a part of the

20  court record, if the Court wouldn't mind if I take a quick

21  moment to review it?

22       THE COURT:  Oh, sure.  I don't know if the whole

23  letter is there but -- it looked like there might have been one

24  page she started to read from, but I'm not sure.  You can

25  certainly look.

 1              And we'll just mark that as a court exhibit.

 2              Mr. Greenley, you may outline the Government's

 3    recommendation for sentence in this case first.

 4              MR. GREENLEY:  I neglected to move to file Exhibit

 5    No. 1 under seal.  May I do that, Your Honor?  That's the DNA

 6    analysis.

 7              THE COURT:  Sure.

 8              MR. BELLMORE:  No objection.

 9              THE COURT:  Pardon?

10              MR. BELLMORE:  I have no objection.

11              THE COURT:  All right.  So Exhibit 1 will be filed

12    under seal and made part of the record in this case.

13              MR. GREENLEY:  Your Honor, the United States

14    respectfully request a sentence of 120 months, the statutory

15    maximum in this case.  It's essentially a downward departure

16    given the guideline range.  We'd ask that Mr. Fly register

17    under SORNA, chapter 117 is covered by SORNA.  It applies to

18    sex offenses, that is a criminal offense that has an element of

19    sexual assault or sexual abuse.  There's a limited exception,

20    basically a statutory rape exception, which does not apply in

21    this case.

22              Pursuant to the plea agreement, the United States

23    recommends ten years of supervised release.  This was a

24    negotiated division that was an incentive for Mr. Fly to plead

25    guilty in this case and not proceed to trial.  Every plea does

1    come with some value to the United States and that was

2    certainly meant as an incentive.

3              We'd ask for restitution in the amount of $19,997.19.

4    I believe it's to Medicare, that's what is outlined in the PSI.

5              Thank you, Your Honor.

6              THE COURT:  Thank you.

7              Mr. Bellmore.

8              MR. BELLMORE:  Thank you, Your Honor.

9              Based on the Court's rulings on the sentencing

10   guidelines here, we did not request a variance in our

11   sentencing memo.  We're not raising that motion today.  Our

12   dispute is with the sentencing guidelines, as already

13   previously discussed.  So that being said, it's pretty

14   straightforward, I think, what is going to be done as far as

15   the term of imprisonment.  I would just like to address a few

16   things.

17             First of all, it should be noted that Fly did sign a

18   plea agreement, he did want to avoid trial.  And as I argued

19   before in discussing the sentencing guidelines, that he does

20   not agree with every accusation that was brought about against

21   him; specifically, in this case or in the cases that took place

22   back in the nineties.  But he certainly did take responsibility

23   for the sexual relationship that took place from basically

24   April until the time of his arrest.

25             As has been discussed before, it is our position that

1    the purpose of these trips was a financial one.  Some of the

2    testimony touched on that this afternoon, that the family

3    needed money.  Mr. Fly was between jobs at that time.  That the

4    primary purpose here was to make money.

5           And why I state that is this is a situation where the

6    allegations where this took place in Texarkana, Texas or

7    Arkansas, there's a city named that on each side of the border.

8    That's 1,300 miles from their home in Rugby.  That's a long

9    ways to go to engage in sexual activity.  I was trying to talk

10   to Canya to see if it was -- to provide some more information

11   sexual activity or sexual abuse, or anything, that took place

12   in between Rugby and Texarkana.  The same goes for Rugby

13   itself, the geographical center of North America is actually

14   squarely placed in the middle of North Dakota, not near the

15   state borders.  They were not traveling outside the state lines

16   in interstate commerce for the purpose of sneaking away or for

17   the other side of that, for Fly to sneak away to abuse his

18   daughter, that this was part of a business trip.  This was not

19   an intentional act as far as to come up with some scheme,

20   elaborate scheme, to take her all the way across the country

21   just to engage in this.  They were working for the family.

22   They were in between jobs at that time.

23          And what wasn't said, and it comes through in some of

24   the discovery, the family was planning to move back to Idaho.

25   They were going to move, once again from Rugby to Idaho.  That

1    explains why they were in between jobs, perhaps why Canya

2    wasn't working at that time.  And so I think that's something

3    that the Court should consider in imposing its sentence.

4            This is a sentence that's going to be imposed under

5    18 USC 2421(a), it's got a ten-year statutory maximum.  Under

6    the guidelines, as the Court has ruled, the guidelines then are

7    120 months.

8            As far as the supervised release, I would join in the

9    Government's recommendation, ten years of supervision.  Excuse

10   me.

11           I will object to any order of restitution.  I don't

12   have it before me and I don't know if the Government has

13   provided it.  I know that off the top, medical bills that

14   indicate that there was $19,000 in expenses and at this time,

15   as was evident by sentencing memo, and it is Mr. Fly's position

16   that he is disputing paternity at this time, he does not want

17   to pay the restitution for the medical bills associated with --

18   for Ms. Fly.

19           It came across, I think, three, if not four, of the

20   witnesses who provided statements this afternoon that Fly was

21   somehow trying to get out of trouble by addressing transgender

22   issues.  That's not the case.  This is an issue that is coming

23   to light because people are becoming more aware of it.  Growing

24   up as Fly did, he's almost 50 years old, that wasn't something

25   that he could be open and upfront about and wasn't something

1    that was in the mainstream.  It's more accepting today.  There

2    was some evidence that was in the PSR that indicated that

3    Canya, when speaking to law enforcement, did describe that her

4    father would have an interest in wearing female clothes.

5    Believes that these transgender issues are legitimate and he's

6    never raised one -- nothing about that has ever been used to

7    explain that he couldn't possibly have done this.  It was not

8    an argument that I have raised in any sort of motion or any

9    sentencing memo or today, that due to transgender issues he

10   could not have committed that offense.  It's not our position.

11            THE COURT:  Well, he admitted to incest.

12            MR. BELLMORE:  Yes.  Transgender issue, my argument

13   is, Your Honor, is separate.  That this is a BOP issue, as it

14   has been a local jail issue.  He wants to make sure that he's

15   placed in the appropriate facility; so we're asking the Court

16   recommend that he be designated to a female facility.

17            THE COURT:  Well, I'm not going to do that.  I'll let

18   BOP decide that.

19            MR. BELLMORE:  And they have protocol, and I know

20   that Fly has looked into that quite a bit and he looks forward

21   to that opportunity to be heard on that.

22            THE COURT:  It's not my decision.

23            MR. BELLMORE:  We know, Your Honor, but I know the

24   Court has the ability to make recommendations as far as

25   placement.

1          I would ask, though, if the Court would consider

2    placing him near California.  That's where he wants to be

3    released, that's where he's initially from.  And as I make that

4    recommendation, I want to point out to the Court that Fly has

5    no intention of harassing or bothering the victim, Canya Fly,

6    in this case or any other family member.  I've spoken at

7    length, through the 18 months that he's been a part of this

8    case, that he has no interest in harassing them or seeking

9    revenge on them.  He's ready, like I'm sure the family is, just

10   to move on from this.  And I think that the time spent in

11   incarceration will help alleviate any concerns the family has,

12   but Fly has assured me that upon release that he has no

13   interest in bothering them.  And I say that because he kind of

14   understands that his family may be permanently broken, that he

15   may not be a part of it.  As the family rebuilds, it's going to

16   be rebuilt without himself.  And he's accepted that.  So for

17   what that's worth, Your Honor, just know that Fly is planning a

18   life -- it's difficult.  This is his family, after all.  He may

19   have some issues he needs to sort out.  Hopefully BOP will give

20   him the programming that he needs, but this was his family and

21   it's lost, most likely.  And he understands that.  I believe

22   he's accepted that.  So with that, Your Honor, I will submit.

23          THE COURT:  All right.  Mr. Fly, I am required, by

24   law, to give you an opportunity to speak here as well today.

25   So if there's anything you wish to say, you're free to speak.

1    If you have any questions, you're free to raise those as well.

2              THE DEFENDANT:  Yes, Your Honor.

3              Some of the things that you heard today were not

4    true.  I want you to know that, even though you think that they

5    are.  I can cross-reference false testimony that my daughter

6    did provide to Amy Chandler over there, in cases that were

7    similar to this that she later admitted that she lied about;

8    where she was kidnapped and raped in Dickinson, where she said

9    that before with Jordyn Clink and his family and his father had

10   did these things to her and forced her to watch porn and caused

11   traumatic incidents with our whole family, which I wanted to

12   bring up in trial.

13             And I was under severe emotional stress from the

14   other place I was at, and I've written you several times on

15   these issues.  And, you know, I would really move to withdraw

16   my plea based on that information.  Because even under *Arar*

17   *versus Ashcroft*, it shows that someone could be forced into a

18   plea agreement when they're under severe emotional stress.  And

19   since this I've had a psych evaluation that shows that I've

20   been emotionally distraught and unstable since being tortured

21   by my medical conditions, which you know about.

22             THE COURT:  Well, you didn't demonstrate any

23   emotional distress when I took your change of plea at a hearing

24   in Fargo.

25             THE DEFENDANT:  In that case I was distressed and I

1  even mentioned to you at that time I said, you know, I've been

2  tortured; and you said you read my letters.  You said, "I know,

3  I've read your letters."  And --

4      THE COURT:  But your letters were all demands for

5  literally hundreds of medical appointments and surgical

6  procedures, and things of that sort.  They didn't reflect any

7  severe emotional stress.

8      THE DEFENDANT:  Well, the medical things that I

9  needed taken care of, they've been torturing me by -- mainly my

10  Reynaud's and placing me in cold facilities and not providing

11  my treatments that I'm supposed to be getting and that other

12  doctors had prescribed.  And then, you know, being transferred

13  from one location to another to -- just to prevent me from my

14  medical care.  And at that particular facility they were very

15  retaliatory towards me based on things that the marshals had

16  told them and false information that they were provided.

17      And, you know, when we were right there at trial,

18  Mr. Bellmore had kind of mentioned, you know, do this and, you

19  know, you'll go home because you got -- you know, you can go

20  home, it will be time served, and whatnot.  And, you know, I'm

21  trying to get my medical taken care of.  I have -- you know,

22  with everything that's going on, and it's just really difficult

23  to deal with this situation and all the things that are going

24  through.  And I really didn't even want to do it then.  And I

25  said, I told him, I don't want to do it; I feel like I'm under

 1   duress with this whole situation; and I'm not, you know, stable

 2   for this at this time because of the conditions that I'm in.

 3   And the, you know, the totality of the conditions was -- you

 4   know, and then the retaliation and humiliations and things that

 5   were going on.  You know, and it was just constant and, you

 6   know, refusing to feed me and stuff, my diet for six weeks, you

 7   know, placing me in cold rooms and, you know, on and on and on.

 8             And I've had a broken jaw and two broken teeth for

 9   19 months now since incarceration, and that has not been

10   treated.  You know, I've gone over and over with constant

11   Eighth Amendment violations, actually First, Fourth, Fifth,

12   Sixth, Seventh, and Eighth, and Fourteenth Amendment violations

13   throughout this whole situation and various other laws and it's

14   been very difficult times.

15             You know, and in resolution of this, when

16   Mr. Bellmore had brought this to me, I really didn't want to do

17   it, you know, and I have written his boss about these

18   situations.  I wrote you to ask you to, you know, supply

19   separate and additional counsel and to help out with this

20   because I was really concerned about the situation.  You know,

21   and being moved all over the state and not being able to have

22   contact with the courts or legal access, and I brought that up

23   also, again, at our hearing that we had in June of last year.

24   That was a status hearing.  I talked to you about that and, you

25   know, how they kept taking me all over, not getting me to the

1   doctor.  And I had -- I'm supposed to see a regular doctor and

2   my endocrinologist wanted me to -- supply medications to me and

3   they moved me away from him, out to Devils Lake where they

4   didn't have no medical care whatsoever for me.

5          And, you know, some of these things that had just

6   went on, like you had been discussing, like the Facebook

7   messages and whatnot, I told her she needed to be more truthful

8   in the situation because she was lying.  And I, you know, was

9   told about her lies.  And then after this event she came and

10  met with me and asked me to help her to do stuff after she had

11  reported these things to Amy Chandler there, and she had come

12  visited me in Minot and we spent time together.  And I took her

13  to take care of her things that she wanted me to help her with.

14  And we had been noticed with other people, which is also

15  documented in this stuff and, you know, she was never forced

16  anything.  You can't force Canya to do anything, you can't even

17  get her cell phone away from her much less do all these

18  horrible things to -- that had been described here.  I would

19  never do them, as a matter of fact.

20          THE COURT:  Well, you admitted in the plea agreement

21  that you engaged in incest.

22          THE DEFENDANT:  I agreed to the factual evidence of

23  that portion of the situation.  I would never force anyone to

24  do anything.  I did that on the feeling of how Mr. Bellmore had

25  come -- and how I was under severe emotional stress.

1          THE COURT:  So did you have sexual intercourse with

2   your young daughter?

3          THE DEFENDANT:  With my young daughter, Your Honor, I

4   emphatically denied the whole thing ever since the beginning of

5   this situation.

6          THE COURT:  Well, you didn't answer my question.  Did

7   you have sexual intercourse with your daughter, Canya?

8          THE DEFENDANT:  Your Honor, as I had told my wife

9   before, if I was asleep, then maybe we had sexual intercourse

10  or, you know, my medications --

11         THE COURT:  I've heard that from 101 pedophiles over

12  the course of my career, they can't remember what happened

13  because they fell asleep or passed out, or words to that

14  effect.

15         THE DEFENDANT:  Your Honor, she was 18 and I had not

16  been alone with her ever before, ever before that, never before

17  that.  And in fact, I have always lived away, working in other

18  states, to take care of the family; and they've been here in

19  Rugby and I've been in Arizona and other places.

20         THE COURT:  Right, but you didn't answer my question.

21         THE DEFENDANT:  I did, Your Honor.  I said if I was

22  asleep and like I had told my wife, then those things, you

23  know, could have happened.

24         THE COURT:  How do you have intercourse when you're

25  sleeping?  How does that work?

1          THE DEFENDANT:  Well, Your Honor, if someone wants to

2     take advantage of you when they're sleeping, they can do so.

3          THE COURT:  All right.

4          THE DEFENDANT:  And that has happened to me one

5     occasion before, which my wife is well aware of, when we were

6     younger.  One of our former friends, who we keep in contact

7     with, had done that to me before.  Okay.

8          THE COURT:  So that's how your daughter, Canya,

9     became impregnated, was that she took advantage of you on a

10    road trip?

11         THE DEFENDANT:  Your Honor, we deny that.

12    Specifically she became pregnant on approximately the 13th or

13    14th of April.

14         THE COURT:  Right.

15         THE DEFENDANT:  And I was in another state at that

16    time while she was in Rugby, and that's where this issue makes

17    it impossible for me to have fathered that child.  And --

18         THE COURT:  Despite the DNA evidence.

19         THE DEFENDANT:  Despite that.  Because DNA evidence

20    can also show that if she had sex with someone else and they

21    have no other people that they've tested, that that would

22    change that and then --

23         THE COURT:  That's not right.

24         THE DEFENDANT:  -- also if it's another relative that

25    she may have done something with it, then that would also cause

1    a false positive like that, Your Honor.  And that was proven --

2    and Mr. Bellmore had that and he was going to present that at

3    trial also, Your Honor.  That's one of the things that we hired

4    a witness for that.

5              And the elements of this offense, to meet the element

6    of it would mean that you would have to -- that would be the

7    motivation for the trip.  Otherwise it does not make the

8    element of the trip.  And this is not the motivation of the

9    trip.  Our trip was specifically motivated as a bona fide

10   business trip.  We were in dire and desperate need to provide

11   the daily necessities to sustain life -- our food, our

12   utilities, our housing, clothing, health care expenses, all

13   that.  We needed to pay our debts, our bills, you know, credit

14   cards with, you know, all our bills and expenses, and we

15   included that due to medical expenses that we had that were

16   unintended.  We had school expenses, the college, we were

17   paying for our kids to go to college.  We had to pay for the

18   college housing and corporate housing out there.

19             THE COURT:  What does that mean, college housing and

20   corporate housing?  Your kids hadn't even graduated from high

21   school yet.

22             THE DEFENDANT:  No, they were -- my -- going to

23   college in Idaho, Xylan was going to college in Idaho when this

24   occurred.  And then Canya had stayed out there by herself with

25   Zelda for a couple months.  And then we had business loans on

1   our equipment and loans for our business use and to, you know,

2   support -- you know, so that we could provide a livelihood.

3   Our cell phones, Internet, and you know, we're trying to obtain

4   jobs with those.  And, you know, the bills and the rental cars

5   for our business, our use of equipment, leases for business

6   uses, our license and registrations and our certification fees,

7   taxes, including our property taxes.

8           THE COURT:  What is a certification fee?  I've never

9   heard of any such thing.

10          THE DEFENDANT:  Well, to pay for certifications we --

11  as a licensed contractor you got to pay for those, and then for

12  different oil field work there's certifications out there and

13  you got to pay for those, and updating your education on those

14  things.  And then as a network engineer, you've got to update

15  education in that field and get the certifications in those.

16  And, you know, so those kind of certifications we need.  And

17  then, you know, when you're driving commercial vehicles, and

18  stuff, you have to pay for certifications for that, like your

19  hazardous materials permit.  You have to pay for the

20  transportation worker identification credential, which I paid

21  for, that's a federal license, essentially, that you have to

22  get.

23          THE COURT:  So you had all these licenses in 2016

24  already and all these certifications?

25          THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Okay.

2          THE COURT:  Why didn't you disclose to the United

3    States Probation Office any information concerning your

4    company, income, assets, liabilities?

5          THE DEFENDANT:  Your Honor, he was provided that

6    information and the -- you know, I told him I don't know what's

7    going on because, you know, according to the thing it says in

8    the last 12 months have you done anything; no, I haven't

9    because I've been incarcerated for now 19 months.  And I don't

10   know what's going on with any of that.  You know, everything I

11   know about is probably seized.  And, you know, our computer

12   equipment, as mentioned in the testimony here, was taken away.

13   You know, all Canya's computers and everybody else's computers

14   were taken.  And then, you know, our stuff's repossessed and

15   all that because I'm not out there making the money to take

16   care of it.  And Canya was paid for -- that's another thing,

17   she was given money all the time.  Anything she ever wanted was

18   bought for her, you know.  And then she had her own credit

19   cards, her own gas cards, her own vehicle that she was driving.

20   She was able to buy gifts for her sister and her mom, and

21   everybody else that she wanted to buy gifts for.  Even on these

22   trips she bought gifts for people with her, you know, money

23   that was provided to her, and -- whenever she wanted to.

24          And, you know, we needed to relocate to Arizona to

25   return to our home where we had business and wanted to be there

97

1    and near Tiffany's father where he had cancer of the prostate.

2    And in order for us to spend as much time with him as we can so

3    our kids could visit with him, you know, before his potential

4    passing and to assist in his relocation to his mother's home in

5    Arizona since her passing away and, you know, due to the

6    extensive bullying that we faced in Rugby and, you know, we --

7              THE COURT:  Bullying by school officials that were

8    wondering why your kids weren't in school?

9              THE DEFENDANT:  Bullying by school officials,

10   bullying by other students that were at the school.  The

11   superintendent of the schools, one day Canya and Xylan had come

12   home crying and saying, oh, he told us that we can't ride on

13   the bus, you know, not in the front of the bus, you got to go

14   to the back of the bus because some other student who was more

15   elite in the town had told them, "Well, no, you can't sit up

16   here, we're going to take this seat."  And then they would tell

17   them, "You can't sit here, you get out of here."

18             And then there were these other kids that live in

19   town -- and I went to the school and asked him, "Well, do you

20   remember Rosa Parks?"  And he said, "Not in my school district,

21   we don't care about that."  And so, you know, he just took the

22   side and then he since left that school.  But, you know,

23   there's -- we're not the only ones that have complained about

24   the bullying there, it was in the Rugby newspaper and, you

25   know, some of the other people they were dealing with, some of

1    the other kids, three of us parents had gone there to talk to

2    the principal one day about certain kids that were bullying

3    their children, and they all happened to be the same kids that

4    were bullying them.  And one took the sportsman of the year, or

5    whatever.  That, you know, was just appalling.

6            But it was the things we were trying to do the best

7    we could for our kids, you know.  And then, you know, we took

8    them and did whatever we could.  So we tried to move away as

9    much as we could to get out of Rugby and move to other places,

10   and things wouldn't pan out for a little while and then we

11   ended up forced back to come back to Rugby.  And, you know, it

12   was just upsetting because none of us wanted to come back,

13   namely the kids.  You know, and this -- and we had made a plan

14   to move back out of state.  And then the kids decided they were

15   going to go back to school in Idaho, and Tiffany and I had

16   planned to go to Arizona.  And Tiffany had asked me to go to

17   Idaho when this happened and to make sure the place was ready

18   for them there.  And we also had a place -- a buyer was willing

19   to trade our property for -- under 1031 exchange for a property

20   in the Idaho area and the kids could have stayed there.

21           THE COURT:  Why aren't those assets listed in the

22   presentence investigation report?

23           THE DEFENDANT:  I don't have those assets.  The only

24   house that we have is the Rugby house, Your Honor.

25           THE COURT:  Well, you just told me you had a house in

1    Arizona and then you've got another one in Idaho and you were

2    willing to exchange properties.

3            THE DEFENDANT:  Your Honor, we don't have a house.

4    We were going to move there and we were going to look for a

5    place there.

6            THE COURT:  But you told me earlier you had a house

7    in Arizona that you were going to.

8            THE DEFENDANT:  No.  My wife's father had a house

9    there that he inherited from his mother.

10           THE COURT:  All right.

11           THE DEFENDANT:  And we were going to move there.

12           THE COURT:  So how do you make a 1031 exchange on a

13   piece of property that you don't own?

14           THE DEFENDANT:  A 1031 exchange for our property in

15   Rugby for the property in Idaho Falls, Your Honor.

16           THE COURT:  Okay.  And that -- you know, we had that

17   lined up and that's the house that they're staying in at this

18   time, in Rugby.  Because this situation happened while I was

19   out there securing that, which there's also Facebook messages

20   to confirm all that and to prove that.

21           THE COURT:  All right.

22           THE DEFENDANT:  And this -- you know, we were trying

23   to build ourselves up and trying to build ourselves back up.

24   And I had just -- when I came back from this, we actually only

25   took two trips together and did -- you know, we were on our own

1  and then the other trips were all with family, we took it with

2  Xylan and with the rest of the family.  And, you know, we took

3  it as a vacation.  And because Zelda was in school, that's why

4  Tiffany couldn't go, and Xylan was having medical issues

5  because he got beat up in college.  And we were trying to take

6  care of this and get those things taken care of and for several

7  months, about a year, I -- we lived pretty much off of all of

8  our credit cards, and that's why we were in debt quite a bit.

9  And we were trying to take this to get moved back out of the

10  area and potentially Arizona, which is our end goal.  And then

11  the thing came up that everybody wanted to go back to school in

12  Idaho, and so we were, okay, we can do that, we can go to Idaho

13  then.  And that was near family too but our -- the one place

14  that we were talking about going to was Arizona.  Namely it's

15  warm there.  You know, it's better for the Raynaud's and that

16  sort of thing.

17          THE COURT:  Better for the what?

18          THE DEFENDANT:  Raynaud's.  My blood circulation

19  shuts off in the cold area.

20          THE COURT:  Oh, the Raynaud syndrome.  I see.  All

21  right.

22          THE DEFENDANT:  Yeah.

23          During this period, you know, when we did these

24  trips, we only did -- like Mr. Bellmore had said, we had gone

25  on the one that went -- we went straight to Minneapolis and

1    came straight back and, you know, that was it.  That was the

2    first one.  And then the next one we went, you know, through

3    the area and then we came straight back.  You know, it was --

4    and then after that we had Xylan with us, and then they were

5    gone for a couple weeks and then we came back.  And then we did

6    the one with the whole family.

7              And some of these trips you had mentioned, that you

8    had talked about other people that you've known that have done

9    this and being able to fly in and fly out, we'd gone to certain

10   remote locations that that was impossible.  Such as the

11   location we went to, the entire family, we picked up another

12   driver in Salt Lake City and we went down to southern Utah,

13   which was really far out in the middle of nowhere, hours and

14   hours and hours away from any other cab driver or any other

15   kind of train or anything to Milford, Utah.  And, you know,

16   that was a location that you couldn't possibly do that.  And we

17   were trying to go and make as much money as quickly as possible

18   that we could so that we could support this move and this was

19   strictly for that reason.  And, you know, therefore, this is

20   not even -- doesn't even meet the element to fit this offense.

21             THE COURT:  Well, we're not talking -- we're not

22   debating the offense.  You plead guilty to it, sir, so it's

23   fruitless to engage in any discussion about whether your

24   activities met the elements of the offense and you plead guilty

25   to it.  You plead guilty to it, you got to live with that.  You

1    got to move on with your life.

2              THE DEFENDANT:  Yeah, but if we move to withdraw the

3    plea --

4              THE COURT:  Well, I'm not going to allow you to

5    withdraw your plea because paragraph 22 of the plea agreement,

6    on the bottom of page 8, you agreed, as follows:  It says,

7    quote, "By signing this plea agreement the defendant

8    specifically waives defendant's right to withdraw a defendant's

9    plea of guilty pursuant to Federal Rules of Criminal Procedure

10   11(d) once the plea has been entered in accordance with this

11   agreement.  The appellate court will enforce such waivers.

12   Defendant agrees that any attempt to withdraw the defendant's

13   plea will be denied, and any appeal of such denial should be

14   dismissed."  So that's what you agreed upon, sir.

15             THE DEFENDANT:  Okay.  Well, like I said, *Arar versus*

16   *Ashcroft* shows that, you know, people under duress and being

17   forced when they're tortured --

18             THE COURT:  When people present themselves to me at a

19   change of plea hearing that are under duress or mentally

20   stressed or being tortured, I don't take a plea from them

21   because it would not be appropriate to do so.  You displayed

22   none of those characteristics to me in Fargo back in January.

23             I fully complied with the Federal Rules of Criminal

24   Procedure.  I took your plea in accordance with every aspect of

25   that rule, and it was a knowing and voluntary plea.  You

1  entered it competently and knowingly of the consequences.  So

2  you've agreed in the plea agreement that you would not attempt

3  to withdraw your plea, and any efforts to do so should be

4  denied by the Court.  So I'm denying your belated motion to

5  withdraw your plea.  You could have filed something in January

6  or February, to that effect, but you hadn't.

7          THE DEFENDANT:  I had asked my lawyer to do so, Your

8  Honor.

9          THE COURT:  Well, I've already ruled on that motion,

10  sir.  I'm not going to allow you to withdraw your plea because

11  you agreed you would not to in the plea agreement.

12          Anything else you wish to say here today?

13          THE DEFENDANT:  Well, Your Honor --

14          THE COURT:  Because I've got other matters I've got

15  to take care, I've got a full schedule and it's running behind

16  schedule.

17          THE DEFENDANT:  I understand, Your Honor.

18          But, again, I've been truthful in this matter and

19  other people haven't.  And like it's stated in the Facebook

20  messages, you know, "Hey, you need to be more truthful in this

21  matter," and, you know, "you haven't been so truthful."  And

22  it's an affirmative defense to any obstruction of justice

23  position that if you're just telling someone to tell the truth

24  that is, you know, an affirmative defense.  And that's all I

25  tried to get her to do was be more truthful.  I said, "You need

1  to be more truthful in this," because I did not do those things

2  that her mother had told me that was said.  And then a few days

3  later we were all together and Canya came to see me and she was

4  happy with me.  And she was, you know, with me and, you know,

5  even close to me and everything else.  She wasn't -- and then

6  her mother even made the statement, "Well, it doesn't seem like

7  someone that had those things done or anyone that's ever afraid

8  of anybody."  And it's absolutely true.  She has -- none of my

9  kids have anything to be afraid of me or my wife, or anybody

10  for that matter.  I'm not aggressive.  I'm not -- I'm not, you

11  know, that kind of person in any way.  And she was fully

12  capable, in control of her own -- sometimes she went hours

13  ahead of me and waited at a location where we met up later on.

14  She could have did whatever she wanted to do there and she had

15  plenty of opportunity to do so.

16            You know, I've never hit her with anything, nor any

17  of my kids.  You know, some of them had even told people about

18  I don't even discipline them.  You know, their mother does but

19  I don't.  I don't yell at them.  I just say, okay, do whatever.

20  Even my son Dillion had told that to a person a few times.

21            THE COURT:  All right.

22            THE DEFENDANT:  But, you know, I wanted to mention

23  that -- you know, and those things -- and I feel that also that

24  this was, you know, kind of an issue that should have dismissed

25  this case to begin with.  The speedy trial rule wasn't met,

1  the -- in the beginning of the case.  And it has to do with the

2  change of the original indictment and, you know --

3            THE COURT:  Mr. Fly, you signed a plea agreement and

4  you waived all affirmative defenses, all legal challenges.  You

5  waived all rights and claims that you had relative to this

6  case, other than a claim under ineffective assistance of

7  counsel.  So I'm not going to waste time and listen to legal

8  matters that you've already affirmatively, in writing, have

9  waived.

10           THE DEFENDANT:  Okay.  All right, Your Honor.  I will

11 definitely appeal on ineffective assistance of counsel.

12           THE COURT:  Well, good luck.

13           Well, I've reviewed the presentence investigation

14 report.  I adopt and incorporate, by reference, into my

15 judgment all of the factual information contained in that

16 report and the guideline calculations which I previously

17 addressed.  The presentence report established an offense level

18 of 35 and a Criminal History Category of II.  The resulting

19 advisory sentencing guideline range is 188 to 235 months.

20 There is a statutory maximum of 120 months in this case, and

21 there's not much that I can do about that.

22           There have been no requests for any traditional

23 departures under the guidelines or variances under the

24 guidelines.  I'm well aware of sentencing factors under 18 USC

25 Section 3553(a) that I'm required to consider.  I have given

1    all of those statutory sentencing factors consideration in this

2    case.

3            The Eighth Circuit Court of Appeals has made it

4    repeatedly clear to sentencing judges in this circuit that when

5    we address and consider the 3553(a) factors, we're entitled to

6    rely upon factual information contained in presentence reports,

7    information contained in sentencing memorandums, letters of

8    support, arguments of counsel, statements made by a defendant

9    at a sentencing hearing and I relied upon all of that

10   information in addressing 3553(a) factors.

11           Pursuant to the sentencing format of 1984, it's the

12   judgment of the Court, Mr. Fly, that you shall be committed to

13   the custody of the Bureau of Prisons to be imprisoned for a

14   period of 120 months, or 10 years, which is the statutory

15   maximum.  Thereafter, I'm placing you on supervised release for

16   a period of lifetime, subject to a number of conditions that

17   I'll outline here shortly.  Both standard conditions of

18   supervision and special conditions of supervision.

19           Now the issue of restitution I'll hold open for

20   60 days and give the parties an opportunity to provide whatever

21   information they want to provide to the Court relative to the

22   subject of restitution.  I haven't been really presented with

23   much, if anything, to date other than the amount.  So there's

24   going to have to be something formally presented in that

25   regard.  And if counsel can agree on a restitution amount, more

1    power to you.  If they can't and we have to have a restitution

2    hearing, I'll do that sometime within the next or at the

3    expiration of 60 days from today.  I'm ordering that the

4    defendant pay a special assessment of $100.  I'm not imposing

5    any fine in this case.

6         So that the record is clear, even if the defendant

7    and his attorney is correct that the offense level should be

8    14, under Section 2G1.1(a)(2), the Court would find by a

9    preponderance of the evidence that there would still be these

10   upward adjustments identified in the presentence report of plus

11   four points under 2A3.1(b)(1) plus two points for the fact the

12   defendant was in supervisory control of the victim under

13   2A3.1(b)(3)(a) and plus two points for obstruction of justice

14   under Section 3C1.1 of the guidelines.  With a resulting

15   adjusted guideline range of 19, Criminal History Category II,

16   advisory guideline range of 33 to 41 months.

17        If the defendant is correct that the appropriate

18   offense level is 14, that's where I would have started from.

19   And if that would have been the resulting advisory guideline

20   range of 33 to 41 months, I would have undoubtedly chosen to

21   depart or vary upward under 18 USC Section 3553(a).  I'm only

22   stating this for the record in case there's some appeal and

23   somebody's challenging guideline calculations, even though in

24   the plea agreement, Mr. Fly, you agreed that you would not

25   challenge the Court's sentencing guideline calculations.  And

1    you agreed in the plea agreement that you only reserve the

2    right to appeal from a sentence that is greater than the upper

3    limit of the court-determined sentencing guidelines.  That's

4    what you agreed to in writing.

5           But if there's an appeal and for some reason it's

6    determined that the appropriate offense level is 14, I would

7    vary upward under 3553(a).  Specifically, I would look at the

8    history and characteristics of Mr. Fly and I think vary upward.

9    And I, without question, have reached the conclusion that he's

10   a pedophile extraordinaire.  And I've dealt with enough people

11   in my history on the bench.  The nature of the offense in this

12   case, coercion and force to engage an innocent daughter to have

13   sex with him, is beyond any level of disgust that I'm familiar

14   with.

15          Looking at the other 3553(a) factors, the seriousness

16   of the offense, providing just punishment deterring future

17   criminal conduct, protecting the public, this was an egregious

18   crime of deviant, dark behavior.  I don't think ten years is

19   enough.  I don't think 50 years is enough.  If I had

20   discretion, I'd sentence you to lifetime.  But I would

21   undoubtedly vary upward in this case if I was required to do so

22   as a result of this matter being remanded for resentencing

23   because the appropriate base offense level was not determined.

24   This is as bad as it gets for sex offenses against young kids.

25          In terms of the, again, the plea agreement, you did

1    agree, sir, to waive all rights in paragraph 22.  You agreed

2    that only to appeal from the upper end of the sentencing

3    guidelines.  I conducted a change of plea hearing on January 5

4    of 2018 and in the plea agreement we discussed, at that time,

5    you agreed that you would not withdraw your plea and I'm going

6    to hold you to that.  You signed a contract, you're going to be

7    held to the contract.  So all of this, what I consider to be,

8    rather nonsensical arguments about being under distress and

9    mentally tortured, in no state of mind to enter plea in January

10   of 2018, I find those arguments to be frivolous.

11          Conditions of supervised release that I'm ordering

12   are as follows.  And you'll get a copy of the judgment and

13   you'll have an opportunity to read through it, and when you're

14   released from BOP custody, you will be assigned a probation

15   officer and they will sit down with you and review all of these

16   conditions.  But I'll summarize them for you and answer any

17   questions that you might have after I've told you what the

18   conditions are.

19          You'll be required to comply with what are known as

20   standard conditions of supervised release, which are conditions

21   that are uniformly imposed for every defendant that's sentenced

22   in federal court.  Standard conditions require that you live a

23   law-abiding lifestyle; they prohibit you from using street

24   drugs, associating with people that do, and associating with

25   convicted felons; you're barred for life from possessing

1  firearms or ammunition; and you'll be assigned a probation

2  officer that you'll have to report to as frequently as they

3  require it of you.

4        Those are the standard conditions of supervised

5  release, any questions about those?

6        THE DEFENDANT:  No, Your Honor.

7        THE COURT:  Special conditions that I'm ordering are

8  as follows:  Ordering that you shall not associate or have

9  verbal, written, telephonic or electronic communication with

10 any person under the age of 18 while on supervised release,

11 unless it's in the presence of a parent or legal guardian and

12 on the condition that the parent or legal guardian is made

13 aware of this conviction.

14        You are prohibited from residing in the home

15 residence or being in the company of any child under the age of

16 18 or dating or socializing with anyone with children under the

17 age of 18, unless it has been approved by your supervising

18 probation officer.

19        You may not engage in any paid occupation or

20 volunteer service which exposes you to, either directly or

21 indirectly, to minors unless it's been approved in advance by

22 the United States Probation Office.

23        You shall have no contact with the victim in this

24 case, or her infant son or any other members of your immediate

25 family by any means in person, by mail or electronic means or

1    through third parties, unless you receive the written

2    permission of the United States Probation Office to do so.

3              I'm ordering that you shall participate in any

4    program or course of study aimed at improving your educational

5    level or your employment skills.

6              I'm ordering that you shall participate in any form

7    of treatment, psychological or psychiatric counseling or

8    treatment or sex offender treatment that the United States

9    Probation Office recommends, which may include inpatient

10   treatment.

11             You are required to abide by all the rules,

12   requirements and conditions of any treatment program and submit

13   yourself to any risk assessment evaluations and physiological

14   testing that may be required of the treatment providers.  I'm

15   ordering that you shall participate in any other form of mental

16   health treatment or counseling that's recommended by the United

17   States Probation Office.

18             I'm ordering that you'll be subject to being

19   monitored by your supervising probation officer.  In other

20   words, they shall monitor all of your activities by any means

21   that are readily available to them including GPS symptoms or

22   any other means or devices that might be used in the future by

23   United States Probation Offices to monitor the activities of

24   sexual predators.

25             I'm ordering that you can be placed in a halfway

1    house at any time while you're on supervised release.  You'll

2    be required to follow all the rules and regulations of that

3    facility.

4            You will be required to register as a sex offender

5    under SORNA -- that's the acronym for Sex Offender Registration

6    Notification Act.  The length of time that you'll have to

7    register will be determined by whatever state that you're

8    living in, working at or attending any form of schooling.

9    Every state has their own sex offender registration

10   requirements and there's also the federal SORNA registration

11   requirement you'll be required to comply with.  But whatever

12   state that you're living in, you're required to comply with

13   both federal law and their state law concerning sex offender

14   registration.

15           Any questions about those conditions?

16           THE DEFENDANT:  No, Your Honor.

17           THE COURT:  All right.  I'll recommend to the Bureau

18   of Prisons that they place you in a federal facility as close

19   as possible to north -- to California, I should say.

20           I'm staying out of the whole mess of gender identity

21   disorders or gender dysphoria, or anything else that's related

22   to those medical terms.

23           And I did overlook one other special condition of

24   supervised release, and that is that you'll be subject to being

25   searched while you're on federal supervision for the remainder

1    of your life.  Search clauses are traditionally ordered for

2    most defendants in the federal criminal justice system.  Search

3    clauses have been challenged by defendants literally hundreds

4    of times, none of which have been successful, to the best of my

5    knowledge.  The reason is the United States Supreme Court has

6    said that people that are in federal supervised release can be

7    searched, any time, any place, there's no need to obtain search

8    warrants or have probable cause to search or to obtain a court

9    order to conduct a search.  You'll be subject to search of your

10   person, all items that you have access to or own or use,

11   subject to search in the residence where you're living, places

12   that you're visiting, work environments where you may be

13   working, motor vehicles that you travel in, computers, cell

14   phones, any form of computer devices.

15            You'll be required to provide the United States

16   Probation Office with any passwords and user names needed to

17   gain access to cell phones, computers, computer devices.

18   Search clauses are fairly uniform throughout the country,

19   nowadays, in federal cases and they're uniform in the State of

20   North Dakota for those convicted of state offenses.

21            Nothing that I have ordered in terms of the special

22   conditions of supervised release are out of the ordinary.  All

23   of these conditions have been challenged by defendants over the

24   years.  None of the conditions that I have ordered have been

25   found to be improper or unreasonable in a case like this.  And

1    with respect to special findings that I'll make that justify

2    the special conditions, it's my finding that by a preponderance

3    of the evidence the defendant is an unevaluated sexual offender

4    with purely an interest in children.  Due to the nature of the

5    offense, the defendant's access to minors should be limited and

6    monitored.

7         I find the defendant may recidivate or violate

8    conditions of supervised release based upon the findings in the

9    presentence investigation report.

10        It's my finding that he may have difficulty securing

11   stable employment.  Upon his release from custody, the use of a

12   residential reentrance center may aide the defendant in that

13   transition.

14        And the defendant has previously had contact with the

15   victim and family members in this case, there have been efforts

16   to manipulate their testimony so there's a need for the no-

17   contact order.

18        Again I'll recommend placement in a facility in

19   California.

20        And I do need to inform you, sir, that you do have

21   the right to appeal.  Every defendant in the federal criminal

22   justice system has a right to appeal after they have been

23   sentenced.  The time period to appeal is extremely short in the

24   federal system, it's 14 days.  The 14 days starts to run when I

25   sign the final paperwork, which is commonly known as the

1  judgment or the judgment of conviction.  I don't know if I'll

2  be signing that paperwork today, but I certainly will be

3  signing it no later than tomorrow.  And when I sign the

4  judgment, it gets electronically filed.  The attorneys are

5  immediately notified, as is the Bureau of Prisons, and that's

6  what starts the 14-day time period to appeal.  So 14 days from

7  tomorrow is the time period that you have to appeal the

8  sentence or the conditions of supervised release that I've

9  ordered.  Do you understand that?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  If you wish to appeal anything that I've

12  ordered here today, you need to talk to Mr. Bellmore right away

13  and tell him that that's what you intend to do.  All that he

14  needs to do is file a one-page, one-paragraph document called a

15  "Notice of Appeal."  By filing a Notice of Appeal, that's what

16  protects your appeal rights.

17          Do you understand?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  If there is no Notice of Appeal filed

20  within 14 days from tomorrow, you've lost your right to appeal.

21          Any questions about that?

22          THE DEFENDANT:  Yes, Your Honor.  I wish to file that

23  Notice of Appeal.

24          THE COURT:  Pardon?

25          THE DEFENDANT:  Yes, Your Honor.  I wish to file that

1    Notice of Appeal.

2         THE COURT:  All right.  Well, let me tell you

3    something else about the appeal.  Paragraph 22 of the plea

4    agreement, that we discussed in detail in Fargo in January, is

5    a paragraph to handle the defendant's waiver of appeal, that's

6    in bold letters.  I went through that with you in some detail

7    at the change of plea hearing.  In that plea agreement you

8    agreed to live by whatever sentencing guidelines I determine

9    apply in this case.  And you agreed, specifically agreed that

10   you would not appeal from any sentence unless it's greater than

11   the upper limit of the court-determined sentencing guideline.

12   So, in other words, you agreed that you would not appeal for

13   any sentence up to the statutory maximum of 120 months.  You

14   agreed to that in writing.  And as I told you at the change of

15   plea hearing, the Court of Appeals enforce these paragraphs

16   against defendants, plea agreements are considered to be

17   contracts.  I told you that the defendants that try to appeal

18   after they have signed a plea agreement like this are rarely,

19   if ever, successful.  The Court of Appeals generally look at

20   the appeal waiver provision of the plea agreement and they look

21   at what the defendant was sentenced.  And as long as the

22   defendants or the defendant was sentenced anywhere to the

23   higher limit of the sentencing guideline range or anywhere

24   below it, they dismiss those appeals every week, every month.

25   So I believe it's clear, crystal clear, that you have

1  forfeited, you have given up your right to appeal in paragraph

2  22 of the plea agreement and you've also forfeited and given up

3  your right to withdraw your plea of guilty. I'm going to hold

4  you to that. I trust that the Court of Appeals will hold you

5  to that as well.

6          Any questions about plea agreement and the fact that

7  you waived your right of appeal?

8          THE DEFENDANT: Only that I was under duress when I

9  signed it, Your Honor.

10          THE COURT: All right. Well, you should have told me

11  about that when you --

12          THE DEFENDANT: I tried to. I told you that I feel

13  like I'm, you know, being under duress and I have anxiety, a

14  lot of anxiety, and I was being tortured.

15          THE COURT: We all have anxiety.

16          THE DEFENDANT: You said you read my letters, which

17  that stuff was included in there.

18          THE COURT: All right. Is there anything else in

19  terms of the counts to be dismissed or anything else that

20  either counsel feels that have been overlooked here today?

21          MR. GREENLEY: I don't believe so, Your Honor. The

22  indictment can be dismissed.

23          THE COURT: I will order the dismissal of the

24  indictment.

25          Does the Government have any objections that they

1    wish to voice on the record here to the sentence that's been

2    imposed or any of the conditions of supervised release that

3    have been ordered?

4         MR. GREENLEY:  No, Your Honor.

5         THE COURT:  Mr. Bellmore, anything that's been

6    overlooked and/or any objections you wish to voice on the

7    record to the sentence or conditions of supervised release?

8         MR. BELLMORE:  Your Honor, briefly I would like to

9    address three objections:  First, I would object to the

10   sentence that is procedurally unreasonable, and that's going

11   back incorporating my once raised sentencing guideline

12   arguments that the correct guidelines in this case resulted in

13   a range of 12 to 18 months.

14        Second, object to the lifetime supervision as being

15   substantively unreasonable given the circumstances in this

16   case.

17        And third, and finally, we would object to the

18   condition imposed requiring compliance with SORNA, as it is our

19   position that SORNA would not be applicable under this specific

20   offense of 18 USC 2421(a) as it is our position that we

21   maintain that this did not involve or meet the definition of

22   sexual abuse.

23        THE COURT:  All right.  Well, so the record is clear,

24   it's my finding, my legal conclusion, that the conviction under

25   18 USC Section 2421, Subpart A, particularly when the

1    cross-reference is triggered, does require registration under

2    SORNA.  And the specific cross-reference that was triggered in

3    this case was a violation of 18 USC Section 2241, Subpart A,

4    and Subpart B, which is crime of aggravated sex abuse, which

5    clearly requires registration under SORNA.

6            The need for lifetime supervision in this case, the

7    reason that I impose lifetime supervision is that that I think

8    that any man or any father that begins sexually molesting one

9    of their children at the age of nine and it continues up to the

10   point where one of those innocent children is impregnated by

11   the father, that poses a risk to everyone, every female of

12   whatever age.  And there's also evidence that I've been

13   presented with here from other sexual offenses that have been

14   committed from Mr. Fly in the past towards other persons.  Only

15   way that I can reasonably protect females in this world is to

16   ensure that Mr. Fly is supervised for the remainder of his

17   life.

18           Anything else?

19           MR. GREENLEY:  Not from the United States, Your

20   Honor.

21           MR. BELLMORE:  Nothing further, Your Honor.

22           THE COURT:  Mr. Fly, I'm going to remand you back to

23   the custody of US Marshals.  I would guess that the Bureau of

24   Prisons is going to move you out of here fairly quickly.

25   Generally they've been moving people out of North Dakota within

1    a week or two after I sentence them, and you'll have to deal

2    with the BOP and where they decide to place you, that's not my

3    call.  I can only make recommendations for placement at a

4    particular facility or geographical area.  I'm not going to

5    recommend placement at a federal prison for females based upon

6    what I know to date, I'll leave that for BOP to sort out.

7             With that, we are adjourned.

8        (Adjourned at 4:41 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>CERTIFICATE</u>

2

3      STATE OF NORTH DAKOTA      )
                                  )      ss
4      COUNTY OF BURLEIGH         )

5

6

7

8          I, Ronda L. Colby, do hereby certify that the

9      foregoing and attached typewritten pages contain an

10     accurate transcription, to the best of my ability,

11     of said proceedings made at the time and place

12     herein indicated.

13         Dated:  March 22, 2018.

14

15

16                         _____

17                         Ronda L. Colby, RPR, CRR
                           Court Reporter
18

19

20

21

22

23

24

25